Argued and submitted November 14, 2019; judgment of conviction affirmed, sentence of death vacated, and case remanded to circuit court for resentencing October 7, 2021

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DAVID RAY BARTOL,
*Defendant-Appellant.*

## (CC 14C46903); (SC S064485)

496 P3d 1013

Defendant was convicted of committing a murder while confined in a penal or correction facility, a crime that, at the time, constituted aggravated murder—the only crime that is punishable by death in Oregon. Defendant was sentenced to death. While defendant's automatic and direct appeal of his conviction and death sentence was pending in the Oregon Supreme Court, the legislature enacted Senate Bill (SB) 1013 (2019), which amended the death penalty statutes such that all of the forms of murder that previously had constituted aggravated murder, including the one of which defendant had been convicted, were reclassified as murder in the first degree and no longer were subject to the death penalty. SB 1013 provided that the change applied only to crimes committed before, on, or after the bill's effective date, September 29, 2019, that were the subject of sentencing proceedings occurring on or after that date—meaning that it did not affect defendant's death sentence. Defendant, who already had filed briefs raising numerous challenges to his conviction and death sentence, and *amicus curiae* Oregon Capital Resources Center filed supplemental briefs, arguing, among other things, that maintaining defendant's death sentence when his crime of conviction no longer constituted aggravated murder and thus no longer was subject to the death penalty violated the prohibitions on cruel and unusual punishment in the Oregon and United States constitutions. *Held*: Defendant's death sentence cannot be maintained because doing so would violate the two special proportionality requirements under Article I, section 16, of the Oregon Constitution: the requirement that the death penalty be limited to offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution and the requirement that there be a fundamental, moral distinction between crimes that are punishable by death and those that are not.

The judgment of conviction is affirmed. The sentence of death is vacated, and the case is remanded to the circuit court for resentencing.

En Banc

On automatic and direct review of the judgment of conviction and sentence of death imposed by the Marion County Circuit Court.

Tracy A. Prall, Judge.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. Timothy A. Sylwester and Jordan R. Silk, Assistant Attorneys General filed the briefs. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Andrew D. Robinson, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender.

Jeffrey Erwin Ellis, Oregon Capital Resource Center, Portland, and Richard L. Wolf, Richard L. Wolf PC, Portland, filed the brief for *amicus curiae* Oregon Capital Resource Center.

DUNCAN, J.

The judgment of conviction is affirmed. The sentence of death is vacated, and the case is remanded to the circuit court for resentencing.

**DUNCAN, J.**

This death penalty case is before this court on automatic and direct review. ORS 138.052(1). In the trial court, defendant was convicted of aggravated murder and sentenced to death. On review, defendant makes numerous challenges to both his conviction and sentence. We reject defendant's challenges to his conviction.[1] But we accept one of his challenges to his sentence. Specifically, we accept his challenge based on Article I, section 16, of the Oregon Constitution, which prohibits disproportionate punishments. As we explain below, after defendant was convicted and sentenced, the legislature enacted Senate Bill (SB) 1013 (2019), which, among other things, reclassified the criminal conduct that had constituted "aggravated murder," which can be punished by death, to "murder in the first degree," which cannot be punished by death. The enactment of SB 1013 reflects a legislative determination that, regardless of when it was committed, the conduct that had constituted "aggravated murder" does not fall within the narrow category of conduct for which the death penalty is appropriate. Given that determination, we conclude that, although the legislature did not make SB 1013 retroactive as to sentences imposed before its effective date, maintaining defendant's death sentence would violate Article I, section 16. Therefore, we affirm defendant's conviction but reverse his death sentence and remand the case for resentencing.

## I.   BACKGROUND

While in custody in the Marion County Jail awaiting trial, defendant killed another person who was also in custody. The state charged defendant with aggravated murder, which, at the time, was defined to include murder committed by a person who was "confined in a state, county or municipal penal or correctional facility or was otherwise in custody when the murder occurred." ORS 163.095(2)(b) (2013), *amended by* Or Laws 2019, ch 635, § 1. Aggravated

---

[1] We have considered all defendant's challenges to his conviction—many of which have been raised and rejected in other death penalty cases—and have concluded that they are either unpreserved or without merit and that further discussion would not benefit the bench or the bar.

murder is the only Oregon crime punishable by death. The state sought the death penalty, and, after a jury trial, defendant was convicted of aggravated murder and sentenced to death. This automatic and direct review followed.

After the parties filed their initial briefs on review, the 2019 Legislative Assembly enacted SB 1013 (2019), which substantially revised Oregon's death penalty statutes. Or Laws 2019, ch 635.

A.  *SB 1013*

Prior to the enactment of SB 1013 in 2019, Oregon had two categories of murder: "murder" and "aggravated murder." "Murder" was defined to include certain forms of criminal homicide, ORS 163.115(1) (2013), *amended by* Or Laws 2019, ch 635, § 4, and "aggravated murder" was defined as "'murder' *** committed under, or accompanied by," any one of 12 enumerated aggravating circumstances, ORS 163.095 (2013), *amended by* Or Laws 2019, ch 635, § 1. Thus, prior to SB 1013, murder committed under or accompanied by any one of 12 aggravating circumstances could result in a death sentence. ORS 163.105(1)(a) (2013); Or Const, Art I, § 40.

SB 1013 changed that. It created a new category of murder, "murder in the first degree"; reclassified all the forms of murder that previously had been "aggravated murder" as "murder in the first degree"; and provided a maximum sentence of life imprisonment without the possibility of parole for "murder in the first degree." Or Laws 2019, ch 635, §§ 1, 3(1), (2). Thus, SB 1013 eliminated the death penalty for all the forms of murder that previously had been eligible for it, including the form that defendant had committed—murder committed when confined to a penal or correctional facility or otherwise in custody.

Although SB 1013 eliminated the death penalty for all the forms of murder that previously had been eligible for it, SB 1013 did not eliminate the death penalty entirely. It redefined "aggravated murder" to include different forms of murder, most of which are more serious forms of murder than those that previously had been classified as "aggravated

murder." Or Laws 2019, ch 635, § 1; ORS 163.095.[2] The forms of murder that constitute "aggravated murder" under the new definition can be punished by death. ORS 163.105(1)(a).[3]

      The legislative history of SB 1013 shows that the legislature's purpose in narrowing the definition of "aggravated murder" was to ensure that Oregon's death penalty statutes do not violate the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments, including disproportionate punishments. The United States Supreme Court has held that the Eighth Amendment requires that the death penalty be "limited to

---

[2] SB 1013 redefined "aggravated murder" as

    "(1) Criminal homicide of two or more persons that is premeditated and committed intentionally and with the intent to:

    "(a) Intimidate, injure or coerce a civilian population;

    "(b) Influence the policy of a government by intimidation or coercion; or

    "(c) Affect the conduct of a government through destruction of property, murder, kidnapping or aircraft piracy; or

    "(2) Murder in the second degree, as defined in ORS 163.115, that is:

    "(a)(A) Committed while the defendant was confined in a state, county or municipal penal or correctional facility or was otherwise in custody; and

    "(B) Committed after the defendant was previously convicted in any jurisdiction of any homicide, the elements of which constitute the crime of aggravated murder under this section or murder in the first degree under ORS 163.107;

    "(b) Premeditated and committed intentionally against a person under 14 years of age;

    "(c) Premeditated, committed intentionally against a police officer as defined in ORS 801.395, and related to performance of the victim's official duties; or

    "(d) Premeditated, committed intentionally against a correctional, parole and probation officer or other person charged with the duty of custody, control or supervision of convicted persons, and related to the performance of the victim's official duties."

As a result of SB 1013, there are now three categories of murder: "aggravated murder," "murder in the first degree," and "murder in the second degree," which consists of the forms of murder that had been classified as "murder" prior to the enactment of SB 1013. ORS 163.095; ORS 163.107; ORS 163.115.

[3] In addition to redefining aggravated murder, SB 1013 made changes to the requirements for imposition of a death sentence. Prior to SB 1013, a jury had to answer four questions in the affirmative in order for a defendant to be sentenced to death. ORS 163.150(1)(b) (2013), *amended by* Or Laws 2019, ch 635, § 5. SB 1013 eliminated the question relating to whether a defendant constitutes a continuing threat, and it imposed a "proof beyond a reasonable doubt" standard of proof on the question relating to whether a defendant should receive a death sentence. Or Laws 2019, ch 635, § 5.

those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 US 551, 568, 125 S Ct 1183, 161 L Ed 2d 1 (2005) (quoting *Atkins v. Virginia*, 536 US 304, 319, 122 S Ct 2242, 153 L Ed 2d 335 (2002)). Testifying in support of SB 1013, former Oregon Chief Justice Paul J. De Muniz told legislators that the "definition of aggravated murder in SB 1013 narrows the cohort of murderers eligible to be put to death by the state, to the 'worst of the worst,' consistent with the requirements of the Eighth Amendment to the United States [Constitution]." Testimony, Senate Committee on Judiciary, SB 1013, Apr 1, 2019, Ex 24 (statement of Paul J. De Muniz). Likewise, Stephen Kanter, former Dean of Lewis & Clark Law School, testified that "[w]hat SB 1013 does finally is reduce aggravated murder in Oregon to that very close[,] narrow category demanded by the US Supreme Court." Testimony, Senate Committee on Judiciary, SB 1013, Apr 1, 2019, Ex 3 (statement of Stephen Kanter).

Opponents of SB 1013 understood that passage of the bill would reflect a new assessment of the gravity of the criminal conduct that was classified as "aggravated murder" at the time. In written testimony, Marion County Deputy District Attorney Katie Suver stated that the bill would change the "entire definition of Aggravated Murder" and, thereby, "repeal what the voters knew to be Aggravated Murder in 1984," when they enacted the death penalty statute that SB 1013 would amend. Testimony, House Committee on Rules, SB 1013, June 5, 2019, Ex 14 (statement of Katie Suver). Lane County District Attorney Patricia Perlow argued that the legislature should not reclassify the conduct that was classified as "aggravated murder" at the time because the 12 aggravating circumstances in the definition were "truly *** aggravated circumstances, worthy of whatever our most severe punishment is going to be." Video Recording, Senate Committee on Judiciary, SB 1013, June 5, 2019, at 1:22 (testimony of Patricia Perlow), https://olis. oregonlegislature.gov (accessed Sept 23, 2021).

When SB 1013 was presented on the floor of each legislative chamber, legislators told their colleagues that SB 1013 would narrow the definition of "aggravated murder"

so that it would apply only to the "worst of the worst," in order to comply with constitutional requirements. Senator Prozanski carried the bill on the Senate floor, explaining:

> "What Senate Bill 1013 will do is the following. It will narrow the number of circumstances that qualif[y] for aggravated murder. Specifically, premeditated and intentional killing of two or more individuals carrying out a terrorist act would be a qualifier. Also, committing murder while the individual is incarcerated in a corrections facility and has already been previously convicted of any type of homicide. Third, for the intentional and premeditated murder of a victim under the age of 14[.]"

Video Recording, Senate Committee on Judiciary, SB 1013, May 21, 2019, at 38:00 (statement of Sen Floyd Prozanski), https://olis. oregonlegislature.gov (accessed Sept 23, 2021). After discussing the history of the death penalty in Oregon, Senator Prozanski discussed the constitutional concerns that motivated the bill:

> "Currently, aggravated murder is subject to constitutional challenges, as I stated. Number one, the U.S. Supreme Court has made it very clear under the Eighth Amendment that it needs to be very narrow in space [*sic*]. As the U.S. Supreme Court has stated, *aggravated murder must be reserved for those that are known as the worst of the worst*. We believe by narrowing the statute that we currently have, we will in fact comply with what the U.S. Supreme Court has stated."

*Id.* (emphasis added). Likewise, when explaining the bill on the House floor, Representative Williamson stated:

> "I believe our aggravated murder statute, and therefore our death penalty system in Oregon, is at serious constitutional risk. The U.S. Supreme Court has held that *a death penalty system must be reserved for the worst of the worst crime*[*s*] in order to be constitutional, and that it must be limited in its application. I believe this bill brings us closer to the constitutional standards and requirements outlined by the U.S. Supreme Court."

Video Recording, House Committee on Judiciary, SB 1013, June 19, 2019, at 3:07 (statement of Rep Jennifer Williamson), https://olis.oregonlegislature.gov (accessed Sept 23, 2021)

(emphasis added). With the issues thus framed, both chambers approved SB 1013.

Governor Brown signed SB 1013 into law on August 1, 2019. In keeping with the expressions of the legislative intent underlying SB 1013, when the Governor signed the bill, she stated that, among other things, it "reserve[s] death sentences for only the rarest and most heinous murders." Governor Kate Brown, SB 1013 Ceremonial Signing Remarks, Aug 1, 2019, https://www.oregon.gov/gov/media/Pages/speeches/bill-signing-SB1013.aspx (accessed Sept 23, 2021).

SB 1013 provides that its changes to the definition of "aggravated murder" apply to "crimes committed before, on or after the effective date of this 2019 Act that are the subject of sentencing proceedings occurring on or after" the bill's effective date, September 29, 2019. Or Laws 2019, ch 635, §§ 30, 31. Therefore, under SB 1013, whether a person can be sentenced to death for criminal conduct that was classified as "aggravated murder" before SB 1013 but is now classified as "murder in the first degree" depends on whether the criminal conduct is the subject of a sentencing proceeding on or after September 29, 2019. Under the bill, if a person engaged in conduct that was classified as "aggravated murder" before September 29, 2019, but is not sentenced until after that date, the person cannot be sentenced to death. As described above, SB 1013 was enacted after defendant had been convicted and sentenced and had filed his opening brief on review.

B.  *Defendant's Arguments About the Effect of SB 1013 on the Constitutionality of His Death Sentence*

One week after SB 1013 was signed by the Governor, defendant moved to file a supplemental brief to address the implications of the new law, and this court granted the motion.

In his opening brief, defendant had argued, among other things, that the death penalty is unconstitutional for all crimes because it violates Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution. Noting that "both constitutions

prohibit 'cruel and unusual punishment,' a phrase which 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,'" he had argued that "the death penalty's national and worldwide decline shows that it has become morally impermissible under society's standards of decency." (Quoting *Trop v. Dulles*, 356 US 86, 101, 78 S Ct 590, 2 L Ed 2d 630 (1958) (plurality opinion).) In his supplemental brief, defendant argued that "SB 1013 is further proof, if more was needed, that standards of decency have evolved, both nationally and in Oregon, to the extent that the death penalty is fundamentally morally impermissible and, therefore, unconstitutional." Alternatively, regarding the criminal conduct for which he was convicted, defendant argued that "SB 1013's abolition of death penalty for murder aggravated solely by its correctional setting is conclusive evidence that in Oregon, at least, moral standards have evolved to the extent that death is an impermissibly excessive punishment for that crime."

In his opening brief, defendant had also argued that his death sentence violated Article I, section 16, and the Eighth Amendment because Oregon's then-existing death penalty statutes did not sufficiently narrow the class of persons eligible for the death penalty. Relying on the rule that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *Zant v. Stevens*, 462 US 862, 877, 103 S Ct 2733, 77 L Ed 2d 235 (1983), defendant had argued that Oregon's then-existing death penalty statutes did not "provide a rational method to determine who will be subject to the death penalty and who will not." In his supplemental brief, he argued that, "by enacting SB 1013, the legislature stated unequivocally that the correctional setting does not 'reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" (Quoting *Zant*, 462 US at 877.)

The case proceeded to oral argument, after which this court allowed the Oregon Capital Resource Center

(OCRC) to appear as *amicus curiae*.[4] In its subsequently filed brief, OCRC asserted, among other things, that defendant's death sentence violates Article I, section 16, and the Eighth Amendment because it does not comport with current standards of decency. *See, e.g.*, *Atkins v. Virginia*, 536 US at 311 (claim that sentence is unconstitutionally excessive is judged in accordance with evolving standards of decency, not standards that prevailed when Bill of Rights was adopted). As objective evidence of those standards, OCRC pointed to (1) SB 1013's narrowing of the definition of "aggravated murder" and the fact that defendant's conduct is no longer classified as "aggravated murder" and, thus, is no longer subject to the death penalty; and (2) historical evidence that, according to OCRC, "establishes that neither Oregon nor any other state has executed an individual for a crime no longer classified as the most serious under state law and which is no longer subject to the death penalty." OCRC asserted that there is

> "a longstanding and vigorous local and national consensus against the execution of an individual for a crime no longer subject to the death penalty—even where the reclassification and removal of that crime from eligibility for the death penalty is by prospective only (or partially-prospective) legislation."

OCRC described historical facts that, in its view, demonstrate that consensus, but it asked to supplement the appellate record because the facts "are not in [defendant's] trial record * * * as SB 1013 was not adopted at the time of his trial." This court allowed the parties and OCRC to file statements of facts, as well as supplemental briefs addressing what relevance, if any, those facts have to the constitutionality of defendant's death sentence.

---

[4] In its motion to appear as *amicus curiae*, OCRC stated that it expected that individuals who were challenging their death sentences would raise new challenges based on SB 1013, which had become effective just over a month earlier. OCRC reported that several individuals who had been challenging their death sentences through habeas corpus proceedings in federal court had successfully moved for stays of those proceedings so that they could file new post-conviction relief petitions in state court to argue that, because the criminal conduct for which they had been sentenced to death can no longer result in death sentences, their death sentences are unconstitutional. OCRC also reported that it expected that individuals who were already litigating post-conviction relief cases in state court would amend their petitions to add claims based on SB 1013.

Defendant and OCRC filed a joint statement of facts, the accuracy of which the state does not dispute.[5] The statement reviews the history of the death penalty in Oregon and every other state. It details when the death penalty was first authorized in each state and whether the death penalty has ever been repealed by the state's legislature, voters, or courts. If the death penalty has been repealed, the statement reports whether any person was executed while the repeal was in effect. The statement covers more than 100 years of the history of the death penalty, and its comprehensive and detailed survey shows that, when the death penalty has been repealed—in part or in full—no person who was sentenced to death before the repeal, but who could not be sentenced to death after the repeal, has been executed. In other words, according to defendant and OCRC, it shows that "no state has executed someone for a crime that was not subject to the death penalty on the day of the execution."

After the filing of the statement of facts, defendant and OCRC filed a supplemental brief addressing the implications of the history recounted in the statement of facts and of SB 1013. The state also filed a supplemental brief.

There have been four rounds of briefing in this case, including two rounds after oral argument. Defendant and OCRC have raised many issues. In the first round of briefing, defendant challenged both his conviction and his sentence. In the subsequent rounds, which followed the enactment of SB 1013, defendant raised additional challenges to his sentence, as did OCRC.

As noted at the outset, we reject defendant's challenges to his conviction—many of which have been raised and rejected in other death penalty cases—without further discussion. But, for the reasons explained below, we agree

---

[5] The material in the statement of facts was drawn from two well-respected national databases: (1) the Espy File, available at https://deathpenaltyinfo.org/executions/executions-overview/executions-in-the-u-s-1608-2002-the-espy-file (accessed Sept 24, 2021), which is maintained by the Inter-University Consortium for Political and Social Research and which covers executions in the United States between 1608 and 2002; and (2) the "Execution Database" maintained by the Death Penalty Information Center (DPIC) in Washington D.C., available at https://deathpenaltyinfo.org/executions/execution-database (accessed Sept 24, 2021) which covers executions from 1976 to the present.

with his argument that, in light of the enactment of SB 1013 in 2019, his death sentence violates Article I, section 16, of the Oregon Constitution.

## II.   ANALYSIS

As mentioned, defendant argues that his sentence violates both Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution.[6] The state responds that defendant's Article I, section 16, challenge is barred by another section of the state constitution: Article I, section 40. We turn to that issue first.

A.   *Whether Defendant's Article I, Section 16, Challenge Is Barred*

In 1984, Oregon voters approved two ballot measures, Measure 7, which reinstated the death penalty, and Measure 6, which provided:

> "The Constitution of the State of Oregon is amended by creating a new section 40 to be added to and made a part of Article I and to read:
>
> "Section 40. Notwithstanding sections 15 and 16 of this Article, the penalty for aggravated murder as defined by law shall be death upon unanimous affirmative jury findings as provided by law and otherwise shall be life imprisonment with minimum sentence as provided by law."

The state argues that the "notwithstanding" clause of Article I, section 40 (the constitutional provision that resulted from the voters' adoption of Measure 6) "precludes any facial or as-applied challenges to defendant's death sentence that are based on Article I, section[] *** 16."

This court addressed the scope of Article I, section 40, in *State v. Rogers*, 352 Or 510, 513-25, 288 P3d 544 (2012). As we will explain, *Rogers* establishes that the only types of challenges barred by Article I, section 40, are

---

[6] Article I, section 16, provides, in part, "Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

challenges to the death penalty *per se*, that is, challenges based on a theory that the death penalty is unconstitutional in all circumstances.

In *Rogers*, the defendant argued that Article I, section 40, had been adopted in violation of the "separate vote" requirement for constitutional amendments. That requirement is set out in Article XVII, section 1, of the Oregon Constitution, which provides, in part:

> "When two or more amendments shall be submitted ＊＊＊ to the voters of this state at the same election, they shall be *so submitted that each amendment shall be voted on separately*."

(Emphasis added.) As the court in *Rogers* explained, the "'separate vote' requirement is 'aimed at ensuring that the voters are able to express their will in one vote as to only one constitutional change.'" 352 Or at 514 (quoting *Armatta v. Kitzhaber*, 327 Or 250, 269, 959 P2d 49 (1998)). It "focuses on the form of the submission of an amendment and the potential changes to the existing constitution that the amendment proposes." *Id.* at 515. An amendment violates the "separate vote" requirement if it proposes two or more substantive changes to the constitution that are not "closely related." *Id.* Consequently, when determining whether an amendment violates the "separate vote" requirement, a court must determine how many substantive changes it makes to the constitution and whether those changes are closely related.

In *Rogers*, the parties disputed how many substantive changes Measure 6 had made to the constitution. The defendant argued that the measure eliminated all types of challenges to death sentences based on either Article I, section 15, which, at the time, prohibited vindictive punishments,[7] or Article I, section 16, which prohibits cruel and unusual punishments and disproportionate punishments. *Id.* at 518. The state disagreed, arguing that Measure 6 was more limited than the defendant contended. *Id.* at 515-16.

---

[7] At the time, Article I, section 15 provided that "[l]aws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice." Or Const, Art I, § 15 (Original). The voters approved an amendment to that section in 1996; it now provides that "[l]aws for the punishment of crime shall be founded on these principles: protection of society, personal responsibility, accountability for one's actions and reformation."

This court agreed with the state, explaining that Measure 6

> "changes sections 15 and 16 by eliminating any constitutional barriers that those sections potentially posed to death as a sanction for aggravated murder; it does not render sections 15 or 16 otherwise inoperable. In other words, the text of the measure appears to preclude challenges to the death penalty as a sanction for aggravated murder; it does not preclude other challenges under Article I, sections 15 and 16."

*Id.* at 519.

Later in the *Rogers* opinion, when determining whether all the substantive changes made by Measure 6 were closely related, this court again addressed the scope of the measure's limitation on challenges based on Article I, section 15, or Article I, section 16. It explained that Measure 6

> "contains only one provision and proposes to do only one thing—prescribe the penalty for aggravated murder. All of the other changes that Measure 6 effects are directed at eliminating the potential constitutional barriers to the imposition of that penalty posed by Article I, sections 15 and 16."

*Id.* at 522-23. Thus, the only challenges to the death penalty that Measure 6 precludes are those based on theories that the death penalty violates either Article I, section 15, or Article I, section 16, in all circumstances.

This court reiterated that understanding of Measure 6 in response to the defendant's argument that the measure did not allow voters to express their will in one vote as to only one constitutional change, explaining:

> "Defendant argues *** that a voter conceivably could favor one or more of the changes that Measure 6 effects and oppose others. For example, defendant suggests, a voter could support the measure's directive that the penalty for aggravated murder is death, but oppose excepting that directive from the relevant provisions of Article I, sections 15 or 16. *But, in so contending, defendant fails to recognize the limits of the measure's effect on those sections. As we have explained, Measure 6 ensures that Article I, sections 15 and 16, will not stand as barriers to imposition of the*

*death penalty. It does not otherwise permit that penalty to be imposed in violation of those sections—for example, by methods that are cruel and unusual.* Because the measure did not propose to eliminate all or any of the protections afforded by sections 15 and 16, it was not possible for voters to separately decide whether they wished to do so. *A voter who favored death as a penalty for aggravated murder could not achieve that objective without also favoring removal of potential barriers to imposition of that penalty, specifically those found in Article I, sections 15 and 16."*

*Id.* at 524 (emphases added).

Thus, the only challenges to the death penalty that Article I, section 40, bars are those that are entirely incompatible with the death penalty as a punishment for aggravated murder as a general matter. For example, because a voter could not simultaneously take a position supporting the reinstatement of the death penalty and a position that the death penalty is cruel and unusual in all circumstances, Article I, section 40, precludes an Article I, section 16, challenge to the death penalty on the ground that it is cruel and unusual in all circumstances. But, because a voter could simultaneously take a position supporting the reinstatement of the death penalty and a position that the death penalty is cruel and unusual a punishment for certain categories of offenders, Article I, section 40, does not preclude an Article I, section 16, challenge to the death penalty on the ground that it is a cruel and unusual punishment for those offenders.

*Rogers* makes clear that Article I, section 40, does not preclude all Article I, section 15, and Article I, section 16, challenges to the death penalty. Indeed, in *Rogers*, this court noted that, after the adoption of Article I, section 40, the court "actually considered, and rejected *on the merits*, certain challenges based on the 'cruel and unusual' and 'proportionate penalty' provisions of Article I, section 16." *Id.* at 520 n 10 (emphasis in original; citing *State v. Rogers*, 313 Or 356, 836 P2d 1308 (1992) *cert den*, 507 US 974 (1993); *State v. Isom*, 313 Or 391, 837 P2d 491 (1992); *State v. McDonnell*, 313 Or 478, 837 P2d 941 (1992); *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28 (1993); *State v. Moen*, 309 Or 45, 786 P2d 111 (1990), *abrogated in*

*part on other grounds by State v. Turnidge (S059155)*, 359 Or 364, 374 P3d 853 (2016)). Therefore, Article I, section 40, does not preclude this court from addressing defendant's claim that his death sentence violates Article I, section 16.

B.   *Whether Defendant's Death Sentence Violates Article I, Section 16*

As mentioned, defendant argues that his death sentence violates both Article I, section 16, and the Eighth Amendment. Ordinarily, this court addresses state constitutional claims before federal ones, *State v. MacBale*, 353 Or 789, 794, 305 P3d 107 (2013), and we do so here. But defendant's state and federal claims are similar, and he supports his state claim with federal cases. Consequently, it is helpful to begin with an overview of the Eighth Amendment and Article I, section 16, and the connections between the two. As we will explain, case law construing the provisions establishes that (1) each provision prohibits disproportionate sentences; (2) whether a sentence is disproportionate is to be determined based on current societal standards; (3) legislative enactments are strong indicators of current societal standards, but are not dispositive of whether a sentence comports with those standards; and (4) when determining whether a sentence comports with those standards, courts also consider, among other things, how the gravity of the crime compares to the severity of the sentence and how the severity of the sentence compares to the severity of sentences imposed for other crimes. We turn first to the Eighth Amendment and case law applying it, which, as we will explain, this court has relied upon when construing Article I, section 16.

1.   *Overview of the Eighth Amendment*

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Although the amendment does not include an express proportionality requirement, the United States Supreme Court has long held that the amendment prohibits disproportionate sentences. As the Court stated in *Weems v. United States*, 217 US 349, 367, 30 S Ct 544, 54 L Ed 793 (1910), when holding that a sentence

violated the Eighth Amendment, "[I]t is a precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." Since *Weems*, the Court has "repeatedly applied this proportionality precept." *Atkins*, 536 US at 311.

The Eighth Amendment is intended to protect individuals against abuse by the government. It has roots in early English laws enacted in response to particular abuses, but it was not intended to protect against only those abuses. As the Supreme Court explained in *Weems*, for the principle underlying the Amendment "to be vital," it "must be capable of wider application than the mischief which gave it birth." *Weems*, 217 US at 373. Thus, the Amendment is "progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id.* at 378.

"The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop*, 356 US at 100 (plurality opinion). "While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." *Id.* Because those standards change, the scope of the Amendment's protection is "not static." *Id.* at 100-01. Rather, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 101; *accord Atkins*, 536 US at 311-12 (quoting *Trop*, 356 US at 100 (plurality opinion)); *see also Estelle v. Gamble*, 429 US 97, 102, 97 S Ct 285, 50 L Ed 2d 251 (1976) ("The Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency *** against which [the Court] must evaluate penal measures." (Internal quotation marks and citations omitted.)).

Consequently, whether a punishment is excessive is "determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail.'" *Kennedy v. Louisiana*, 554 US 407, 419, 128 S Ct 2641, 171 L Ed 2d 525 (2008) (quoting *Atkins*, 536 US at 311); *see also Roper*, 543 US at 561 (stating that the Court has "established the propriety and affirmed the necessity of referring to 'the evolving standards of decency

that mark the progress of maturing society' to determine which punishments are so disproportionate as to be cruel and unusual" (quoting *Trop*, 356 US at 100-01 (plurality opinion)).

Courts play a critical role in protecting against disproportionate punishments. Generally, legislatures determine the punishments that may be imposed for crimes, and courts defer to those determinations. But the fact that a punishment is authorized by a legislature does not mean that the punishment comports with current standards of decency as required by the Eighth Amendment, and courts have an obligation to ensure that punishments do not violate that requirement. As Justice Stewart stated,

> "[a]lthough legislative measures adopted by the people's chosen representatives provide one important means of ascertaining contemporary values, it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power."

*Gregg v. Georgia*, 428 US 153, 174 n 19, 96 S Ct 2909, 49 L Ed 2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (citing *Weems*, 217 US at 371-73); *see also State v. Santiago*, 318 Conn 1, 135, 122 A3d 1 (2015) ("When an appellate court is asked to pass on the constitutionality of a mode of punishment, it is, almost invariably, after a defendant has been found guilty of a crime and sentenced in accordance with a duly enacted penal statute. If the fact that an elected legislature had authorized and enacted the punishment in question were enough to insulate it from judicial scrutiny, then the freedom from cruel and unusual punishment would be a hollow one.").

The Supreme Court has held in a number of cases that a sentence violated the Eighth Amendment because it was disproportionate to the defendant's crime, even though the sentence was authorized by statute. For example, in *Solem v. Helm*, 463 US 277, 303, 103 S Ct 3001, 77 L Ed 2d 637 (1983), the Court held that the imposition of a sentence of life without parole, pursuant a recidivist statute, was unconstitutional for the defendant's seventh nonviolent felony,

passing a worthless check. *See also Graham v. Florida*, 50
US 48, 82, 130 S Ct 2011, 176 L Ed 2d 825 (2010) (holding
that the Eighth Amendment bars sentences of life without
parole for nonhomicide offenses committed by juveniles).
Of particular relevance to this case, the Court has held in
several cases that death is a disproportionate punishment
for certain crimes and offenders. *E.g.*, *Kennedy*, 554 US at
437-38 (holding that the death penalty is a disproportionate
punishment for nonhomicide crimes against individuals);
*Roper*, 543 US at 575 (same for crimes committed by juve-
niles); *Atkins*, 536 US at 321 (same for crimes committed
by intellectually disabled defendants); *Enmund v. Florida*,
458 US 782, 797-801, 102 S Ct 3368, 73 L Ed 2d 1140 (1982)
(same for felony murder, if the defendant did not take or
attempt to take a life, or intend that lethal force would be
employed).

When determining whether a sentence is a dispro-
portionate punishment for a crime, the Supreme Court's
task is to determine whether the sentence comports with
contemporary standards of decency. To do so, the Court con-
siders a variety of factors, including how many jurisdictions
authorize the sentence for the crime at issue, how frequently
the sentence is actually imposed and carried out for the
crime, whether the gravity of the crime corresponds to the
severity of the sentence, whether the severity of the sentence
corresponds to that of sentences imposed for other crimes,
and whether the severity of the sentence is justified by legit-
imate penological purposes. *E.g.*, *Kennedy*, 554 US at 422-47
(applying that approach); *Enmund*, 458 US at 789-801 (same);
*Coker v. Georgia*, 433 US 584, 593-600, 97 S Ct 2861, 53 L Ed
2d 982 (1977) (plurality opinion) (same).

2.  *Overview of Article I, section 16*

Article I, section 16, is similar to the Eighth
Amendment, but it includes an express proportional-
ity requirement. It provides, "Excessive bail shall be
required. Excessive fines shall not be imposed. Cruel and
unusual punishments shall not be inflicted. All penalties
shall be proportioned to the nature of the offense."

When construing Article I, section 16, this court
has built on federal precedent and, like the Supreme Court,

has held that whether a sentence is a disproportionate punishment depends on current societal standards. In *Sustar v. County Court for Marion County*, 101 Or 657, 665, 201 P 445 (1921), this court announced a standard for determining whether a punishment is disproportionate to an offense, stating:

> "In order to justify the court in declaring punishment cruel and unusual with refence to its duration, the punishment must be so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances[.]"

The court cited the Supreme Court's decision in *Weems* as the source of that standard. *Id.* In *Weems*, the Court concluded that the Eighth Amendment was intended to prohibit punishments that "would shock the sensibilities of men," 217 US at 375—a conclusion that points to societal standards as the basis for a determination that a punishment violates that Amendment. But, in *Weems*, the Court had more to say about the Eighth Amendment's reliance on societal standards: It also held that the Amendment is "progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id.* at 378. Thus, when this court adopted the *Weems* standard for purposes of the proportionality requirement of Article I, section 16, in *Sustar,* it adopted a standard that looks to evolving societal standards when determining whether a sentence violates the proportionality requirement. *See Rogers*, 313 Or at 380 (stating that, in *Sustar*, this court cited *Weems* "for the Eighth Amendment standard and adopt[ed] that standard for the purposes of Article I, section 16").

In *State v. Wheeler*, 343 Or 652, 175 P3d 438 (2007), this court noted that, although it had interpreted Article I, section 16, in a number of cases, it had not yet "reviewed in any detail the origins of the proportionality requirement in an effort to determine what the framers of the Oregon Constitution were concerned about, and therefore intended, when they adopted" the provision, *id.* at 656-57, and it took the opportunity to conduct that review, *id.* at 657-67. The court began with the text of Article I, section 16, and concluded that the text evidenced an intent to require a

"comparative relationship" between punishments and the offenses for which they are imposed:

> "The term 'proportion' indicates a comparative relationship between at least two things. *See, e.g.*, 2 Noah Webster, *An American Dictionary of the English Language* 45 (1828) (<proportion> indicates a <comparative relation>). Here, the two things being related are <penalties> and <the offense>, and the provision requires that the penalties for each particular offense be <proportioned>—that is, comparatively related—to that offense. *The strong implication of that requirement is that a greater or more severe penalty should be imposed for a greater or more severe offense, and, conversely, that a less severe penalty should be imposed for a less severe offense.*"

*Id.* at 655-56 (emphasis added). The court then examined the history of the requirement, tracing its roots to early English laws and reviewing William Blackstone's views on the necessity of proportionality in sentencing, noting that those sources had informed the efforts of the drafters of early American state constitutions. *Id.* at 656-67. Blackstone, the court recounted, had "maintained that punishment should be proportional to the offense in question and to the social aims of criminal punishment generally. 'The method *** of inflicting punishment ought always to be proportioned to the particular purpose it is meant to serve, and by no means exceed it[.]'" *Id.* at 658 (quoting 4 William Blackstone, *Commentaries on the Laws of England* 12 (1769) (ellipsis and brackets in *Wheeler*)). And the court quoted Blackstone's observation that

> "[i]t has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments, descending from the greatest to the least; but, if that be too romantic an idea, *yet at least a wise legislator will mark the principal divisions, and not assign penalties of the first degree to offenses of an inferior rank.*"

*Id.* at 662 (quoting 4 Blackstone, *Commentaries* at 18 (emphasis added)).

After reviewing proportionality requirements in early state constitutions and noting that the records of the Oregon Constitutional Convention do not reveal any

discussions of Article I, section 16, the court concluded that Article I, section 16, was based on the same concerns that "had led Blackstone and later the framers of state constitutions *** to emphasize the need for proportionality in sentencing." *Id.* at 667. "At the most basic level," the court summarized, "the framers' concern was that the penalty imposed on a criminal defendant be 'proportioned' to the specific offense for which the defendant was convicted—that it bear the appropriate 'comparative relation' to the severity of that crime." *Id.*

Regarding the test for determining whether a punishment violates Article I, section 16's proportionality requirement, the court in *Wheeler* looked to *Sustar*, in which—as quoted above—the court had stated:

> "In order to justify the court in declaring punishment cruel and unusual with reference to its duration, the punishment must be so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances."

*Wheeler*, 343 Or at 668 (quoting *Sustar*, 101 Or at 665); *see also id.* (noting that the court had "used the 'shock the moral sense' standard" in subsequent cases). The court then refined that test, explaining that it did not think that, in *Sustar*, the court had

> "intended the test literally—that is, that a penalty for a particular crime would meet the proportionality requirement if a single 'reasonable person' could be found whose moral sense was not 'shocked' by that penalty. Rather, we read the court's words as attempting to articulate a standard that would find a penalty to be disproportionately severe for a particular offense only in rare circumstances."

343 Or at 670. The court also noted that, when it had applied the test in some cases, it had "looked to the legislative enactment of the particular penalties at issue as an external source of law to assist in determining whether those penalties would shock the moral sense of reasonable people." *Id.* at 670-71. In other words, it had looked to legislative enactments as indicators of current societal standards.

In *Wheeler* this court emphasized that it is the legislature's role to establish the penalties for violations of

criminal statutes, and that the court's role is only to determine whether those penalties exceed constitutional limits. *Id.* at 671-72. Later, in *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009), the court reiterated that point, stating that the legislature plays "the central role" in establishing penalties for crimes and that "[i]t is not the role of this court to second-guess the legislature's determination of the penalty or range of penalties for a crime." "However," the court continued,

> "it is the role of the court to ensure that sentences conform to requirements that have been in our constitution for 150 years. And, when we conclude that, because of its length, a sentence is inconsistent with Article I, section 16, as we have on at least three occasions, we should hold that sentence unconstitutional."

*Id.* (citing *State v. Shumway*, 291 Or 153, 630 P2d 796 (1981); *Cannon v. Gladden*, 203 Or 629, 281 P2d 233 (1955); *State v. Ross*, 55 Or 450, 104 P 596, *modified on reh'g*, 55 Or 474, 106 P 1022 (1910), *appeal dismissed*, 227 US 150, 33 S Ct 220, 57 L Ed 458 (1913)). Thus, this court must give effect to the proportionality requirement of Article I, section 16, which "is not merely aspirational, but was intended to protect Oregon's citizens against penalties that are disproportionate to their offenses." *Id.* at 80.

This court has fulfilled its role under Article I, section 16, on more than one occasion, reversing sentences that it deemed to be disproportionate to the defendants' crimes, even though the sentences were authorized by statute. For example, in *Rodriguez/Buck*, which involved two cases that had been consolidated for review, this court affirmed the trial courts' conclusions that the statutorily mandated 75-month sentence for first-degree sexual abuse was disproportionate to the defendants' crimes where (1) the defendants' conduct involved limited physical touching over clothed body parts; (2) the conduct was far less severe than other conduct that fell within the broad definition of first-degree sexual abuse and was punishable by the same sentence; (3) the conduct was also less severe than conduct covered by the second-degree sexual abuse statute that was punishable by a far shorter sentence; and (4) the

defendants had no prior convictions. 347 Or at 67-80.[8] And, in *State v. Davidson*, 360 Or 370, 391, 380 P3d 963 (2016), this court held that a life sentence imposed pursuant to a recidivist statute was disproportionate to the defendant's crime, public indecency, where the defendant's criminal history "include[d] no offenses more serious than public indecency (and no other misconduct that otherwise support[ed] a conclusion that he pose[d] a significant physical danger to society)."

To summarize, Article I, section 16, expressly prohibits disproportionate punishments. It embodies "the basic proportionality concept" that "more serious crimes should receive more severe sentences than less serious crimes and vice versa." *Rodriguez/Buck*, 347 Or at 61. Or, to echo Blackstone, "penalties of the first degree" should not be assigned to "offenses of an inferior rank." 4 Blackstone, *Commentaries* at 18, quoted in *Wheeler*, 343 Or at 662. Like the Eighth Amendment's proportionality requirement, Article I, section 16's proportionality requirement must be interpreted based on current societal standards. It is not static; it evolves as societal standards change. When determining whether a punishment is disproportionate, courts apply the standards that currently prevail. And finally, while it is the role of the legislature to establish penalties for criminal statutory violations, it is the role of the courts to give effect to the constitutional proportionality requirement—by setting aside punishments that, under prevailing societal standards, are disproportionate to the offenses for which they are imposed.

3.  *Special proportionality requirements for the death penalty*

The basic proportionality concept that the gravity of an offense should correspond to the severity of the punishment gives rise to special rules for the death penalty. As we will explain, the Supreme Court has so held for the purposes of the Eighth Amendment, and we do so here for the purposes of Article I, section 16.

---

[8]  The sentencing statute at issue in *Rodriguez/Buck* had been enacted by the voters, exercising their legislative authority. 347 Or at 79.

The death penalty is the most severe punishment, and it differs in kind from all other punishments. It is "unique in its severity and its irrevocability." *Gregg*, 428 US at 187 (opinion of Stewart, Powell, and Stevens, JJ.). "Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity. No other existing punishment is comparable to death in terms of physical and mental suffering." *Furman v. Georgia*, 408 US 238, 287, 92 S Ct 2726, 33 L Ed 2d 346 (1972) (Brennan, J., concurring). "The unusual severity of death is manifested most clearly in its finality and enormity. Death, in these respects, is in a class by itself." *Id.* at 289. It is "qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 US 280, 305, 96 S Ct 2978, 49 L Ed 2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)

Because death is the most severe punishment, it must be reserved for the most serious offenses. As the Supreme Court has held, the death penalty "must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper*, 543 US at 568 (quoting *Atkins*, 536 US at 319). "The rule of evolving standards of decency with specific marks on the way to full progress and mature judgment means that resort to the penalty must be reserved for the worst of crimes and limited in its instances of application." *Kennedy*, 554 US at 446-47. That is, it must be reserved "for those crimes that are so grievous an affront to humanity that the only adequate response may be the penalty of death." *Id.* at 437 (internal quotation marks omitted).

Relatedly, because the death penalty must be reserved for the most serious crimes, death-eligibility factors must provide a "fundamental, moral distinction" between a crime that is serious enough to deserve the death penalty and one that is not. *Id.* at 438. A factor justifying imposition of the death penalty must both "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the

defendant compared to others found guilty of murder." *See Zant*, 462 US at 877 (so holding when evaluating whether statutory aggravating circumstances sufficiently circumscribe the class of persons eligible for the death penalty).

We agree with the Supreme Court that the death penalty must be reserved for the "worst of crimes," *Kennedy*, 554 US at 446-47, and that there must be a "fundamental, moral distinction" between crimes that are punishable by death and those that are not, *id.* at 438. Those requirements are consistent with Article I, section 16's proportionality requirement that the most severe punishments should be reserved for the most serious crimes, and we now apply them in our Article I, section 16, analysis of defendant's death sentence.

4.   *The effect of SB 1013 on defendant's death sentence*

As recounted above, through the enactment of SB 1013, the legislature chose to narrow the definition of "aggravated murder" so that it would be limited to conduct that the legislature regarded as the "worst of the worst." In hearings on SB 1013, proponents and opponents of the bill alike explained that the bill asked legislators to make an assessment regarding the relative gravity of the conduct that was classified as "aggravated murder" at the time. Specifically, they explained that the bill asked legislators to determine that that conduct was not the "worst of the worst" and to reclassify it as "murder in the first degree," the maximum sentence for which would be life in prison without parole. The legislators who carried the bill in each chamber of the legislature did the same. Senator Prozanski told the Senate that "aggravated murder must be reserved for those that are known as the worst of the worst" and that SB 1013 would do that. Video Recording, Senate, SB 1013, May 21, 2019, at 38:00 (statement of Sen Floyd Prozanski). Likewise, Representative Williamson told the House that SB 1013 would reserve the death penalty for "the worst of the worst." Video Recording, House, SB 1013, June 19, 2019, at 3:07 (statement of Rep Jennifer Williamson). With the issue clearly presented, the legislature passed SB 1013. Thus, the enactment of the bill reflects a legislative determination that the conduct that was classified as "aggravated murder"

before the enactment of SB 1013 does not fall within the narrow category of conduct for which the death penalty can be imposed.

Importantly, the legislature made that determination with respect to conduct committed both before and after the effective date of SB 1013. That is evidenced by the fact that the legislature provided that SB 1013 applies to "crimes committed before, on or after [its effective date] *** that are the subject of sentencing proceedings that occur on or after" that date. Or Laws 2019, ch 635, § 30. That provision shows that the legislature did not regard conduct committed before the effective date as more culpable than conduct committed after it.

Under SB 1013, whether a person who committed conduct that was previously classified as "aggravated murder" but is now classified as "murder in the first degree" can be sentenced to death depends on the person's sentencing date, not on the relative gravity of the conduct. To illustrate: If two persons jointly engaged in conduct that was previously classified as "aggravated murder" but is now classified as "murder in the first degree," and the first person was sentenced before SB 1013's effective date but the second person was sentenced after that date, the first person could be sentenced to death, but the second person could not. As that hypothetical illustrates, SB 1013 creates a proportionality problem: It allows the execution of persons whose conduct the legislature has determined is *not* the worst of the worst and whose culpability is *no different* from those who cannot be executed. Under SB 1013, persons who engage in exactly the same conduct, at exactly the same time, can receive uniquely different sentences: one cannot be executed, but the other one can, even though the legislature has determined that the conduct is not the type for which death sentences can be imposed.

Here, defendant was sentenced to death before the effective date of SB 1013, so that legislation does not directly apply to his sentence. But our task is not to determine the application of SB 1013 to defendant's sentence—instead, we must evaluate the constitutionality of his sentence under Article I, section 16, in light of current societal standards.

Legislative enactments are strong indicators of those standards, and the enactment of SB 1013 shows that the legislature has determined that, regardless of when it was committed, conduct that was previously classified as "aggravated murder" but is now classified as "murder in the first degree" does not fall within the narrow category of crimes for which the death penalty can be imposed. Importantly, that moral judgment stands apart from the question of retroactivity. Although the legislature did not make SB 1013 retroactive as to sentences imposed before its effective date, the enactment of the bill itself reflects a judgment that conduct that was previously classified as "aggravated murder" does not fall within the narrow category of conduct that can be punished by death, as opposed to lesser sentences, including life imprisonment. Consequently, maintaining defendant's death sentence in this case would violate two special proportionality requirements that, under Article I, section 16, apply to the death penalty: the requirement that the death penalty "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution,'" *Roper*, 543 US at 568 (quoting *Atkins*, 536 US at 319), and the requirement that there be "a fundamental, moral distinction" between crimes that are punishable by death and those that are not, *Kennedy*, 554 US at 438. Maintaining his death sentence would allow the execution of a person for conduct that the legislature has determined no longer justifies that unique and ultimate punishment, and it would allow the execution of a person for conduct that the legislature has determined is no more culpable than conduct that should not result in death. Therefore, in light of the legislature's enactment of SB 1013, we conclude that defendant's sentence violates Article I, section 16.[9]

---

[9] We emphasize that our decision in this case is based on special proportionality rules that apply to the death penalty, which are the result of the unique differences between the death penalty and all other punishments, discussed above. 368 Or at 621-23.

In addition, we note that our conclusion is consistent with how others have responded to similar changes in the law. As the historical information submitted by defendant and OCRC shows, whenever a state's laws have changed so that persons with existing death sentences would not be eligible for the death penalty if they were sentenced under the new law, those persons have not been executed. As defendant and OCRC summarize:

The judgment of conviction is affirmed. The sentence of death is vacated, and the case is remanded to the circuit court for resentencing.

---

"When the death penalty was thrice eliminated here in Oregon—in 1914 and 1964 by constitutional amendment and in 1981 by this Court's decision in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981)—all outstanding death sentences were vacated. And the same result appears in other states: every state that has enacted legislation prospectively abolishing the death penalty has nevertheless overturned all remaining death sentences. Likewise, when states have exempted certain defendants from execution but otherwise left the death penalty in place, courts have overturned the death sentences of condemned prisoners who would otherwise have fit within the exemption, but for the date of their crimes. This has been the outcome even where the legislature clearly and expressly intended that its repeal not reach existing death sentences."