IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA**,
*Plaintiff/Petitioner*,

*v.*

**BEAU JOHN GREENE**,
*Defendant/Respondent*.

No. CR-21-0082-PC
Filed April 14, 2023

On Review from the Superior Court in Pima County
The Honorable Wayne E. Yehling, Judge
No. CR048730-001
**REVERSED**

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Jeffrey L. Sparks, Chief
Counsel, Ginger Jarvis (argued), Assistant Attorney General, Phoenix,
Attorneys for State of Arizona

Todd Jackson (argued), Meighan LaFata, Jackson & Oden, PLLC, Tucson,
Attorneys for Beau John Greene

Mikel Steinfeld, Arizona Attorneys for Criminal Justice, Phoenix, Attorney
for Amicus Curiae Arizona Attorneys for Criminal Justice

JUSTICE MONTGOMERY authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK and KING joined.[*]

JUSTICE MONTGOMERY, Opinion of the Court:

¶1 We consider in this case whether legislative amendments to A.R.S. § 13-751(F)(5), enacted in 2019, provide a basis for post-conviction relief ("PCR") under Arizona Rule of Criminal Procedure 32.1(a), (c), (g), and (h) for a sentence of death imposed in 1996. Because the amendments are prospective only and the 1996 sentence is constitutional under the United States and Arizona Constitutions, we hold they do not provide a basis for relief.

## I. HISTORICAL BACKGROUND

### A. Murder, Conviction, and Sentence

¶2 Beau John Greene murdered University of Arizona music professor Roy Johnson on February 28, 1995, beating him to death in Johnson's car and then abandoning his body in the desert. *State v. Greene*, 192 Ariz. 431, 435 ¶¶ 2, 5 (1998). Johnson's wife had expected him home before 10:00 p.m., but he never returned. *Id.* ¶ 2. He was last seen the evening of the 28th leaving the Green Valley Presbyterian Church, where he had given an organ recital. *Id.* On the night of the murder, "Greene and Johnson crossed paths, but the record does not tell us how." *Id.* ¶ 4. Four days later, Johnson's body was discovered "lying face down in a wash." *Id.* ¶ 2.

¶3 After dumping Johnson's body in the wash, Greene stole his car and wallet and embarked on a "spending spree using Johnson's cash and credit cards." *Id.* ¶ 8. Greene purchased "clothes, food, camping gear, a scope and air rifle, and a VCR (which he later traded for methamphetamine)" while feigning injury to his hand to "explain any discrepancies between his signature and those on the credit cards." *Id.*

¶4 A jury convicted Greene of first degree murder—felony and premeditated—robbery, kidnapping, theft, and six counts of forgery. *Id.*

---

[*] Justices John R. Lopez IV and James P. Beene are recused from this case.

at 434–35 ¶ 1. The trial court sentenced him to death for the murder of Johnson based on two aggravating circumstances: (1) the murder was committed for pecuniary gain, A.R.S. § 13–703(F)(5) (1996); and (2) the murder was committed in an especially heinous or depraved manner, § 13–703(F)(6) (1996).[1]  *Id.* at 439 ¶¶ 32–33.

## B.  Direct Appeal

**¶5**       This Court affirmed Greene's convictions on direct appeal for first degree murder, robbery, theft, and forgery, and affirmed his death sentence.  *Id.* at 435 ¶ 1.  As to the robbery count, the Court considered whether the trial court erred in denying Greene's motion for a directed verdict.  *Id.* at 436 ¶ 12.  Greene argued there was "no direct evidence that he intended to take the victim's property at the time he used force." *Id.* at 437 ¶ 13.  This Court noted, though, that "[a]fter stealing Johnson's car, and within hours after killing him, he began spending Johnson's money and using his credit cards."  *Id.* ¶ 14.  Therefore, in conjunction with the evidence at the crime scene, the Court concluded that "[a] rational trier of fact could have found beyond a reasonable doubt that Greene's use of force against Johnson was accompanied by an intent to take Johnson's property." *Id.* ¶ 15.

**¶6**       The Court reversed the kidnapping conviction because there was no evidence that "Greene, while in the car, knowingly restrained Johnson before bludgeoning him, or whether he simply chose to strike him at an opportune moment."  *Id.* ¶¶ 17–18; A.R.S. § 13-1304(A)(3) (requiring that a defendant knowingly restrain a victim with intent to "[i]nflict death, physical injury or a sexual offense . . ., or to otherwise aid in the commission of a felony" for a kidnapping conviction).

**¶7**       The Court likewise reversed the trial court's finding that the murder was especially heinous or depraved under the (F)(6) aggravating circumstance based on "relishing, senselessness, and helplessness" because there was insufficient evidence that "Greene relished the murder beyond a reasonable doubt" at the exact moment he murdered Johnson.  *Id.* at 440–

---

[1] Citations to statutes and rules are to current versions that have not been materially altered unless otherwise noted.   In 2008, § 13-703 was amended and renumbered as § 13-751.   2008 Ariz. Sess. Laws ch. 301, §§ 26, 38 (2d Reg. Sess.).

41 ¶¶ 33, 42. The Court therefore concluded that "[a]bsent a finding of relishing, the (F)(6) aggravator cannot stand, because senselessness and helplessness, without more, are ordinarily insufficient to prove heinousness or depravity." *Id.* at 441 ¶ 42.

¶8 With respect to the (F)(5) pecuniary gain aggravating circumstance, the Court observed that "Greene's actions after the murder also demonstrate[d] a pecuniary motive." *Id.* at 439 ¶ 30. The Court recounted evidence of "Greene's admitted need for money, drugs, and transportation." *Id.* ¶ 29. Combined with the evidence that Greene "had [Johnson's] wallet with him when he left the wash immediately following the murder," it was clear that Greene "intended to profit from the murder no later than the moment he picked up the object to kill Johnson." *Id.* ¶¶ 28–29, 32. Therefore, "[t]he evidence support[ed] beyond a reasonable doubt a finding that Greene, coming off of methamphetamine and penniless, killed Johnson to obtain cash or credit cards." *Id.* ¶ 32.

## C. First PCR Petition

¶9 Greene filed his first PCR petition in August 2000. He raised several claims of ineffective assistance of counsel, sought reevaluation of his death sentence, presented impeachment evidence regarding Johnson's wife, and argued that he was entitled to have a jury sentence him. The superior court held an evidentiary hearing. Greene recounted that after Johnson drove them to a church parking lot, Greene left the car and put on a lead-lined "handmade 'sap' glove,"[2] before returning to the car and beating Johnson to death with it, rather than his fists as he testified at trial. The court denied the PCR petition in January of 2003.

¶10 This Court denied Greene's petition for review of that decision on December 5, 2003, and issued a warrant for his execution on

---

[2] According to Greene, the glove was "[a] thinner glove inside a larger welding-type glove, a great big glove. And inside was [sic] little pouches of lead shot that had been sewn into the back of the smaller leather glove, and then the larger glove was sewn over that to hold everything into place."

January 14, 2004. Greene's execution was subsequently stayed on December 8, 2008, pending federal habeas review.[3]

## D. Successive PCR Petition

**¶11**　　　　On May 26, 2020, Greene filed this successive PCR petition in the superior court. Greene argued that he was entitled to relief under Rule 32.1(a), (c), (g), and (h) because his death sentence was now unconstitutional under the United States and Arizona Constitutions as a consequence of the 2019 legislative amendments to the (F)(5) aggravating circumstance. The State argued in response that Greene was not entitled to any relief because the amendments were prospective only and therefore inapplicable to his sentence and that no legal basis existed to render his sentence unconstitutional. [4] Following an evidentiary hearing, the superior court granted Greene the relief he sought for each claim under Rule 32.1 and vacated his sentence of death.

**¶12**　　　　We granted review to address whether Rule 32.1(a), (c), (g) or (h) permit relief when the legislature made a prospective change to the definition of a capital aggravating circumstance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4239.

## II.　　ANALYSIS

**¶13**　　　　The State argues that because the (F)(5) amendments are not retroactive and there is no basis on which to find Greene's sentence is unconstitutional, he is not entitled to any of the relief he seeks and the

---

[3] Greene's habeas proceedings continue in federal court. *See Greene v. Shinn*, No. CV-03-00605-TUC-JCH, 2021 WL 3602857, at *28 (D. Ariz. Aug. 13, 2021) (denying relief in part and granting relief in part based on finding that Arizona Supreme Court used an unconstitutional causal nexus test to assess Greene's mitigation evidence) (appeal stayed pending these proceedings).

[4] The State also offered arguments concerning timeliness and preclusion. However, at oral argument the State acknowledged, without conceding the point, that it was not challenging the superior court's rulings concerning the timeliness or preclusion of Greene's claims. As the State has abandoned this argument, we do not address it further.

superior court erred in ruling otherwise. Greene argues that the superior court was correct in granting relief under Rule 32.1(a), (c), (g), and (h) because the (F)(5) amendments reflect a determination by the legislature that a murder committed for pecuniary gain does not demonstrate the extreme culpability justifying the imposition of a death sentence. Therefore, he argues that to carry out his sentence now when his criminal conduct is no longer subject to capital punishment would violate the United States and Arizona Constitutions pursuant to the Eighth Amendment and article 2, section 15, respectively. Thus, Greene asserts that the amendments to (F)(5) are applicable to his sentence.

¶14 We review a superior court's ruling on a PCR petition for an abuse of discretion, which occurs if the court makes an error of law. *State v. Pandeli*, 242 Ariz. 175, 180 ¶ 4 (2017). A superior court's legal conclusions are reviewed de novo. *State v. Miller*, 251 Ariz. 99, 102 ¶ 8 (2021).

¶15 Because each party's arguments and the analysis of the superior court are premised on the legislature's amendment of the former (F)(5) aggravating circumstance, we begin by reviewing the role of aggravating circumstances in capital cases and the specific amendments in question.

## A. Aggravating Circumstances And The 2019 Amendments To (F)(5)

¶16 For a defendant to qualify for capital punishment, a jury must unanimously find that the state has established the existence of one or more aggravating circumstances listed at § 13-751(F) during the aggravation phase of a capital trial. A.R.S. § 13-752(E) ("If the trier of fact unanimously finds no aggravating circumstances, the court shall then determine whether to impose a sentence of life or natural life . . . ."); *State v. Thompson*, 252 Ariz. 279, 295 ¶ 53 (2022) ("[T]he death penalty cannot be imposed in the absence of aggravating circumstances."). The state must prove the existence of an aggravating circumstance beyond a reasonable doubt. A.R.S. § 13-751(B). If one or more aggravating circumstances are proven, the matter proceeds to the penalty phase. A.R.S. § 13-752(F).

¶17 During the penalty phase, the jury "shall take into account the aggravating and mitigating circumstances that have been proven, and if it unanimously determines that there are no mitigating circumstances

sufficiently substantial to call for leniency," the jury "shall impose a sentence of death."[5]   A.R.S. §§ 13-751(E), -752(H); *see also State v. Prince*, 226 Ariz. 516, 526 ¶ 16 (2011) (discussing the "jury's duty to 'assess whether to impose the death penalty based upon each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of any mitigating evidence.'" (quoting *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 472 ¶ 17 (2005)).

¶18        In 2019, the Arizona Legislature narrowed the statutory aggravating circumstances that a jury may consider in determining whether to impose a sentence of death by amending several provisions of § 13-751(F).    2019 Ariz. Sess. Laws ch. 63, § 1 (1st Reg. Sess.).    The amendments did not alter the first two aggravating circumstances, § 13-751(F)(1) (prior conviction of another offense punishable by life imprisonment or death) and § 13-751(F)(2) (serious offense).   However, three were completely eliminated: § 13-751(F)(3) (grave risk of death to another person); § 13-751(F)(13) (murder committed in cold and calculated manner); and § 13-751(F)(14) (use of a stun gun).   *Id.*   With respect to § 13-751(F)(5), the legislature amended its language, combined it with the § 13-751(F)(4) aggravating circumstance, and renumbered the new provision as § 13-751(F)(3).   *Id.*   The remaining aggravating circumstances were only renumbered.   *Id.*

¶19        Before 2019, (F)(4) read: "The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value."   A.R.S. § 13-751(F)(4) (2018).   The (F)(5) aggravating circumstance read: "The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."   § 13-751(F)(5) (2018).   The new (F)(3) reads: "The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value, or the defendant committed the offense as a result of payment, or a promise of payment, of anything of pecuniary value."   Thus, the legislature effectively limited a jury's consideration of a pecuniary gain motive for murder to circumstances of a murder-for-hire.

---

[5] If the jury unanimously determines that a sentence of death is not appropriate, the court imposes a sentence of either life or natural life. A.R.S. § 13-752(H).

## B. Retroactivity Of (F)(5) Amendments And Greene's Conduct

### 1. Retroactivity[6]

**¶20** The State argues that the legislature did not make the amendments to (F)(5) retroactive. Statutes are retroactive only if "expressly declared therein," subject to an exception for procedural changes not applicable here. A.R.S. § 1-244; *State v. Fell*, 210 Ariz. 554, 560 ¶¶ 21–23 (2005) (finding changes to sentencing circumstances a substantive change to the law requiring an express declaration of retroactivity). While acknowledging this requirement, the superior court nevertheless concluded that "[t]he [l]egislature intended explicitly for defendants affected by the repeal of the aggravating circumstances outlined in S.B. 1314 to resolve their claims through the post-conviction relief process."

**¶21** The court based this conclusion on the following exchange between legislators:

> Representative Rodriguez asked, "If there's a discussion about these not being persuasive, why are we not being asked to make this change retroactive, to eliminate these in past cases where they have been used?" In response to the question, Chairperson John Allen stated, "But Mr. Rodriguez, it doesn't preclude them from suing over it. You know, asking for relief, though usually, the courts don't apply it that way." Upon hearing this statement, Representative Rodriguez pointed to Chairperson Allen and nodded in agreement.

*Hearing on S.B. 1314 Before the H. Comm. on the Judiciary*, 54th Leg., 1st Reg. Sess. (Ariz. 2019). However, such a limited exchange between two representatives in a committee hearing is not sufficient to establish that the legislature intended to make the amendments retroactive. *See Barlow v. Jones*, 37 Ariz. 396, 399 (1930) ("A legislative enactment cannot be amended or changed either by the insertion or the elimination of words to conform with an intent proven by the testimony of the members of the enacting

---

[6] Greene does not directly challenge the lack of an express statement of retroactivity but rather argues that the amendments are retroactive based on a violation of the Eighth Amendment. We address this argument at Part II.C.

body."); *see also Tucson Gas & Elec. Co. v. Schantz*, 5 Ariz. App. 511, 514 (1967) (stating that "the testimony or opinions of individual members of the legislative body are not admissible" for discerning legislative intent); *Arizona Citizens Clean Elections Comm'n v. Brain*, 234 Ariz. 322, 325 ¶ 12 (2014) (observing that "a legislator, lobbyist, or other interested party lacks competence to testify about legislative intent in passing a law").

**¶22** Significantly, the bill as signed into law does not contain a retroactive-application clause—nor was there any effort to add one at any step in the legislative process. Furthermore, retroactivity is not referenced in any bill draft, summary, or analysis for § 13-751(F). *Compare* 2009 Ariz. Sess. Laws, ch. 190, § 1 (1st Reg. Sess.) (providing that the law "applies retroactively to all cases in which the defendant did not plead guilty or no contest and that, as of April 24, 2006, had not been submitted to the fact finder to render a verdict"), *with* 2019 Ariz. Sess. Laws ch. 63, § 1 (1st Reg. Sess.) (lacking any retroactivity clause). Thus, despite the colloquy relied on by the superior court, the amendments to (F)(5) are not retroactively applicable to cases preceding the 2019 enactment. *See, e.g.*, *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 270 (1994) (declining to find a preemptive intent in the absence of explicit language required for preemption given that "the legislature is well aware of the words of art that should be used to accomplish such a result"). The court erred in concluding otherwise.

### 2. The (F)(5) amendments, Greene's motive, and his criminal conduct

**¶23** The State argues that because the (F)(3) aggravating circumstance still addresses pecuniary gain, the amendments to (F)(5) did not eliminate pecuniary gain from consideration as to whether to impose a sentence of death. The State also observes that Greene's criminal conduct remains subject to the (F)(2) (serious offense) aggravating circumstance, which the superior court did not consider in its analysis.[7] Regardless of any express statement of retroactivity, Greene argues that because the amendment to the former (F)(5) aggravating circumstance eliminated the basis for which his sentence of death was imposed, the legislature

---

[7] The State did not raise this particular point until its response to an amicus brief before this Court. Nonetheless, Greene's broad argument that his conduct is no longer subject to the death penalty necessitates consideration of the entirety of the aggravating circumstances in § 13-751(F).

"abolished" the application of the death penalty to his criminal conduct. The superior court agreed with Greene and found "that the reasoning in the [l]egislative record including the reasons for the proposed legislation was to narrow the applicability and imposition of the death penalty in which [Greene], under the [l]egislature's narrowing, is no longer eligible for the death penalty."[8]

**¶24**     Greene's argument requires us to carefully evaluate what the legislature did and did not do in amending § 13-751(F) as a whole. *See State v. Ewer*, 523 P.3d 393, 397 ¶ 13 (Ariz. 2023) ("[W]e 'interpret statutory language in view of the entire text, considering the context and related statutes on the same subject'" (quoting *Molera v. Hobbs*, 250 Ariz. 13, 24 ¶ 34 (2020)).   As discussed, the amendments to (F)(5) narrowed a jury's consideration of a murder motivated by the expectation of pecuniary gain to murder-for-hire scenarios.   *See* Part II.A ¶ 19.   Thus, although the State accurately notes that the legislature did not completely eliminate the consideration of pecuniary gain from Arizona's set of aggravating circumstances, Greene is correct that the legislature did eliminate a jury's ability to consider his own motive for murdering Johnson.   However, the 2019 amendments did not change the (F)(2) aggravating circumstance, which considers whether "[t]he defendant has been or was previously convicted . . . for serious offenses committed on the same occasion as the homicide."   Thus, a robbery committed contemporaneously with a murder—the exact criminal conduct Greene engaged in—remains subject to a jury's consideration of whether to impose the death penalty.

**¶25**     Informing our analysis of the nature and effect of the (F)(5) amendments with respect to Greene's sentence of death is the fact that the legislature amended (F)(2) in 2003 to address the use of contemporaneous serious offenses effected by this Court's ruling in *State v. Rutledge*, 205 Ariz. 7 (2003), *supplemented State v. Rutledge,* 206 Ariz. 172, *superseded by statute*, 2003 Ariz. Sess. Laws ch. 255, § 1 (1st Reg. Sess.), *as recognized in State v. Nordstrom*, 230 Ariz. 110, 118 ¶ 35 (2012) (observing that amendment to

---

[8] The superior court also considered what it characterized as legislators' concerns about "how their actions contributed to complying with the constitutional mandate of *Hidalgo*."   However, there is no such "constitutional mandate" provided by *Hidalgo*.   The language cited by the court is in a dissent to a denial by the Supreme Court of a writ of certiorari. *Hidalgo v. Arizona*, 138 S. Ct. 1054 (2018).

(F)(2) aggravating circumstance "evidently was intended to displace our ruling in *State v. Rutledge*"). In the supplemental opinion, this Court stated that a "conviction for a 'serious offense' occurring simultaneously with a murder conviction cannot be used for (F)(2) purposes under the [pre-2003] version of [§] 13-703(F)(2)." *Rutledge*, 206 Ariz. at 178 ¶ 25. In amending (F)(2), the legislature made it explicitly clear that contemporaneous serious offenses could be considered, providing that: "The defendant *has been* or was previously convicted of a serious offense, whether preparatory or completed. *Convictions for serious offenses committed on the same occasion as the homicide, . . . shall be treated as a serious offense . . . .*" 2003 Ariz. Sess. Laws ch. 255, § 1 (1st Reg. Sess.) (emphasis added). Thus, after the 2003 amendment to (F)(2) until the 2019 amendments to (F)(5), the state could allege as aggravating circumstances a murder committed contemporaneously with a robbery and a murder motived by the expectation of pecuniary gain for murders committed like Greene's.

¶26        Consequently, the overall effect of the 2019 amendments to (F)(5) with respect to Greene's criminal conduct is that although a jury can no longer consider Greene's *motive* for robbing and murdering Johnson, a jury can still consider his actual *conduct* of robbing and murdering Johnson. So, if Greene committed the same murder today, he would still be eligible for the death penalty, albeit under a different aggravating circumstance. Greene is therefore incorrect in concluding that the legislature "abolished" the death penalty for his criminal conduct and the superior court erred in concluding likewise.

## C.  Eighth Amendment

¶27        The State argues that Greene's sentence was constitutional when imposed and there is no basis for concluding today that it violates the Eighth Amendment. Greene argues, and the superior court found, that his sentence is unconstitutional under the Eighth Amendment because the legislature's narrowing of the pecuniary gain aggravating circumstance demonstrates a judgment that his criminal conduct is no longer deserving of capital punishment. Therefore, he asserts that his sentence is in violation of contemporary standards of decency and to carry it out would also be contrary to a national consensus against imposing punishment after a repeal of the death penalty.

¶28        "The Eighth Amendment, applicable to the states through the Fourteenth Amendment . . . proscribes 'all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 n.7 (2002)).    Punishment for the crime must be proportionate to the offense to comport with this constitutional guarantee.    *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) ("Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment . . . ."); *see also Weems v. United States*, 217 U.S. 349, 367 (1910) ("[I]t is a precept of justice that punishment for crime should be graduated and proportioned to offense.").

¶29        Under the Supreme Court's Eighth Amendment jurisprudence, whether a punishment is excessive and disproportionate is "determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail.'" *Kennedy*, 554 U.S. at 419 (quoting *Atkins*, 536 U.S. at 311).    Such norms are derived from "evolving standards of decency that mark the progress of a maturing society."    *Trop v. Dulles*, 356 U.S. 86, 99–101 (1958) (considering "whether denationalization is a cruel and unusual punishment within the meaning of the Eighth Amendment" in case involving desertion during wartime).    "Thus, an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment."    *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).    "Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent." *Coker v. Georgia*, 433 U.S. 584, 592 (1977).

¶30        In previous cases, the Supreme Court has considered four categories of data for Eighth Amendment consensus assessments: (1) legislative actions; (2) opinions of juries; (3) judgment of prosecutors; and (4) historical practice. *See, e.g.*, *id.* at 593–97 (legislatures and juries); *Enmund v. Florida*, 458 U.S. 782, 789–96 (1982) (legislatures, juries, and prosecutors); *Atkins*, 536 U.S. at 313–17 (legislatures); *Roper v. Simmons*, 543 U.S. 551, 560–68 (2005) (legislatures and historical practice); *Kennedy*, 554 U.S. at 422-34 (legislatures, juries, and historical practice).    Nonetheless, any consensus demonstrated by the preceding is not necessarily controlling.    *Kennedy*, 554 U.S. at 421 (stating that "[c]onsensus is not dispositive").    Whether a punishment is disproportionate ultimately depends on "the Court's own

understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," which includes whether the death sentence would fulfill a penological purpose. *Id.* at 421, 441.

¶31 In sum, a death sentence is unconstitutional under the Eighth Amendment if both (1) evolved societal standards of decency demonstrate a consensus against the punishment and (2) the court's independent judgment concludes that the sentence is not proportionate to the crime. *Id.* at 446.

### 1. Consensus against Greene's punishment

¶32 The State argues no consensus exists against executing a defendant for the (F)(5) aggravating circumstance. Greene's argument, though, is that there is a consensus against executing a defendant whose criminal conduct no longer justifies the imposition of the death penalty. In granting Greene the relief he sought, the superior court concluded that "there is a national consensus against executing defendants for a crime that is no longer eligible of the death penalty." We consider each category of information set forth by Greene and the sources of information relied on by the superior court in turn.

### a. *Legislative action*

¶33 The State argues that because the legislature retained consideration of pecuniary gain in the current (F)(3) aggravating circumstance and that Greene's conduct is still subject to capital punishment under the (F)(2) aggravating circumstance, the legislature's actions do not establish an evolved community standard against Greene's punishment. Greene argues that the repeal of the pecuniary gain circumstance as applicable to his crime reflects a judgment by the legislature that his criminal conduct does not demonstrate the extreme culpability justifying the imposition of a sentence of death. Greene therefore argues that this judgment reflects a standard of decency precluding his punishment. The superior court likewise found that the actions of the legislature, combined with information about juries, established a community standard against executing a defendant "convicted of murder solely for pecuniary gain, except in cases of murder-for-hire."

¶34 As reiterated in *Atkins*, the "clearest and most reliable" objective indication of a national consensus concerning imposition of the death penalty is "the legislation enacted by the country's legislatures." 536 U.S. at 312 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)). In cases where the Supreme Court concluded that legislative action established a standard of decency precluding capital punishment, legislatures categorically limited the imposition of the death penalty for defendants who lacked the requisite intent to kill their victim or who had specific physical or mental characteristics that diminished their moral culpability. *See Coker*, 433 U.S. at 592–93 (finding that "[a]t no time in the last 50 years have a majority of the States authorized death as a punishment for rape" to conclude that death penalty for rape of an adult woman where victim is not killed is "forbidden by the Eighth Amendment as cruel and unusual punishment"); *Enmund*, 458 U.S. at 792, 801 (finding that "only a small minority of jurisdictions—eight—allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed" to hold the Eighth Amendment prohibited sentence of death for a defendant who "did not commit and had no intention of committing or causing" deaths of robbery victims); *Atkins*, 536 U.S. at 317–21 (concluding there was a "consensus unquestionably reflect[ing] widespread judgment about the relative culpability of mentally retarded offenders" and therefore the Eighth Amendment prohibited the death penalty for such defendants); *Roper*, 543 U.S. at 568 (holding that because "[a] majority of States have rejected the imposition of the death penalty on juvenile offenders under 18," the Eighth Amendment now prohibits it, as well); *Kennedy*, 554 U.S. at 413, 423 (noting that forty-four states did not provide for capital punishment in cases of rape to hold the Eighth Amendment prohibited sentence of death for raping a child under twelve because defendant did not kill nor intend to kill the victim); *see also State v. Nelson*, 229 Ariz. 180, 188 ¶ 33 (2012) (noting the cases of *Atkins*, *Roper,* and *Kennedy* "turned on the characteristics of the defendant or the nature of the crime"). Importantly for our assessment, after enactment of the legislation considered in each case there was no longer a basis upon which any other defendant who committed a similar crime under similar circumstances could be subjected to capital punishment.

¶35 Here though, the Arizona Legislature did not enact similar legislation that categorically exempts Greene from a sentence of death based on any lack of intent to kill or physical or mental characteristic

diminishing his moral culpability. Nor did the legislature foreclose imposition of a death sentence for a defendant who commits a similar crime under similar circumstances as Greene. Again, while Greene's pecuniary gain *motive* for murdering Johnson may no longer be considered by a jury in determining whether to impose a death sentence, the legislature did not eliminate consideration of his *conduct* in murdering Johnson.

¶36 Greene's argument overstates the effect of the legislature's amendments of (F)(5) and incorrectly equates the actions of the Arizona Legislature with those of legislatures relied on by the Supreme Court to find a death sentence unconstitutional under the Eighth Amendment. [9] Anyone who robs and kills in 2023 as Greene did in 1995 is still subject to the imposition of a death sentence regardless of the 2019 amendments. Therefore, Greene's reliance on legislative action to support his argument of a consensus against his punishment is misplaced and the superior court erred in concluding that the legislature established a "community standard of decency" in determining the constitutionality of Greene's sentence.

b. *Jury opinions*

¶37 The State argues that jury sentencing decisions concerning the (F)(5) aggravating circumstance do not establish a community standard precluding Greene's sentence. Greene argues that the limited number of times the (F)(5) circumstance has served as the basis for a sentence of death since 2002 is evidence that juries do not find the aggravating circumstance persuasive and therefore establishes a community standard precluding his punishment. The superior court likewise concluded a community standard existed, in conjunction with the actions of the legislature, to render Greene's sentence unconstitutional.

¶38 When considering evolving standards of decency and the constitutionality of imposing a death sentence, "the response of juries reflected in their sentencing decisions are to be consulted." *Coker*, 433 U.S. at 592.

¶39 The jury information Greene presents consists of the fact that out of 142 capital cases reviewed by this Court on direct appeal since 2002,

---

[9] Notably, the former version of (F)(5) remains an aggravating factor for consideration in federal death penalty cases. *See* 18 U.S.C. § 3592(C)(8).

only three defendants were sentenced to death based solely on the (F)(5) aggravating circumstance for a murder motivated by pecuniary gain, though one involved a murder-for-hire circumstance. He also cites a prosecutor's legislative testimony before the House Judiciary Committee that juries did not find the (F)(5) aggravating circumstance persuasive. The State presented data that juries have actually sentenced defendants to death while also finding the (F)(5) aggravating circumstance proven in ten out of sixty-five cases between 2008 and 2012.

¶40        The limited information provided by Greene, as well as the State, regarding the sentencing decisions of juries makes discerning a particular community standard on this basis tenuous. Jury sentencing data reviewed by the Supreme Court in *Coker* encompassed *all* cases reviewed by the Georgia Supreme Court involving rape from 1973 to when the case came before the Supreme Court in 1977. *Id.* at 596. The evidence presented showed that Georgia juries had sentenced a defendant to death for rape only six times out of the sixty-three cases. *Id.* at 596–97.

¶41        In *Enmund*, the evidence demonstrated that among defendants executed in the United States since 1954, in only six executions out of 362 was "a nontriggerman felony murderer"—like Enmund—executed. 458 U.S. at 794–95. Enmund also presented information regarding the number of defendants on death row whose sentencing information reflected that they intended to kill the victim. *Id.* at 795.

¶42        Where the information was sufficient for review, out of 739 defendants, "only [forty-one] did not participate in the fatal assault on the victim." *Id.* at 795. Furthermore, where sufficient data was available, "only [sixteen] were not physically present when the fatal assault was committed." *Id.* Among that number, thirteen were sentenced to death with "a finding that they hired or solicited someone else to kill the victim or participated in a scheme designed to kill the victim." *Id.* Enmund was one of only three who did not fall into any of the other categories. *Id.* Among forty-five felony murderers then on death row just in Florida, "[i]n only one case—Enmund's—there was no finding of an intent to kill and the defendant was not the triggerman." *Id.* The Supreme Court therefore concluded that "the statistics [Enmund] cites are adequately tailored to demonstrate that juries—and perhaps prosecutors as well—consider death a disproportionate penalty for those who fall within his category." *Id.* at 796.

¶43        In contrast to the data presented in *Coker* and *Enmund*, Greene's information is limited, at best.   Neither Greene nor the State presented evidence of the number of murders where the only aggravating circumstance alleged and proven was (F)(5) and a jury did *not* impose a death sentence, making the imposition of a sentence of death an impossibility.   *See* A.R.S. § 13-752(E) (requiring the imposition of a life sentence "[i]f the trier of fact unanimously finds no aggravating circumstances" proven).   Additionally, as the superior court noted in considering the jury information presented by the State, "neither do we know the number of failed prosecutions under the circumstance in which juries rejected it as an aggravator."   And in contrast to the more robust comparative information provided in *Enmund*, Greene has not presented any data offering a relative comparison with other defendants on death row in other states, let alone in Arizona.

¶44        With respect to the prosecutor's comment concerning the lack of persuasiveness for juries of the aggravating circumstances in the proposed legislation, Greene overstates its significance.   The prosecutor never discussed the narrowing effect of the proposed amendments to (F)(5).   Rather, she specifically referred to aggravating circumstances proposed for *elimination* stating: "those factors which we are proposing to eliminate, simply, historically have not been the most persuasive with juries in capital cases.   And so, it's our proposal to remove them from the list of aggravating factors."   *Hearing on S.B. 1314 Before the H. Comm. on the Judiciary*, 54th Leg., 1st Reg. Sess. (Ariz. 2019).   Although the pecuniary gain aggravating circumstance was narrowed to murder-for-hire cases, the only aggravating circumstances that were eliminated and removed were (F)(3), (F)(13), and (F)(14).   *See* Part II.A ¶ 18.   Additionally, no supporting information was ever presented concerning (F)(5) and the view of juries from the prosecutor's perspective at the legislative committee hearing, or in the course of Greene's PCR briefing, or in the evidentiary hearing.

¶45        We also observe that Greene's argument based on the purported evidence of juries' sentencing decisions concerning the (F)(5) aggravating circumstance illustrates a fallacy of weak induction—the logical fallacy of false cause.   This type of fallacy occurs where the link between a premise and a conclusion ignores other factors.   *The Fallacy of False Cause*, The Cambridge Dictionary of Philosophy 515 (Robert Audi ed., 3d ed. 2015).

¶46          Even accepting the assertion that the (F)(5) aggravating circumstance was among those the prosecutor referenced as not "persuasive" for juries, other valid reasons exist to explain why there are a limited number of jury-imposed death sentences based solely on (F)(5) since 2002.    For example, the limited number of cases could be due to the limited number of murders that are committed solely for pecuniary gain without the application of other statutory aggravating circumstances.    It could also be due to charging decisions made in light of evidentiary considerations. *See* A.R.S. § 13-751(B) ("The prosecution must prove the existence of the aggravating circumstances beyond a reasonable doubt.").    Given that any aggravating circumstance must be proven beyond a reasonable doubt, there may be relatively few cases where the evidence is sufficient to prove that pecuniary gain was a motive for a murder or, relatedly, it may be that the state just failed to meet its evidentiary burden in those particular cases.    In that instance, a jury verdict would provide no basis for a conclusion that it actually reflected a jury's assessment of the moral culpability of a murderer motivated by the expectation of pecuniary gain.    And, even if there are cases where (F)(5) was alleged as the sole aggravating circumstance and a jury determined a life sentence was the appropriate punishment, it is just as reasonable a possibility that a defendant presented strong mitigation evidence.    *See* § 13-751(E) ("The trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency.").

¶47          Thus, a limited number of jury verdicts alone does not necessarily reflect a jury opinion that the (F)(5) aggravating circumstance was not a proper basis for imposing a sentence of death.    That a sentence is infrequently imposed does not necessarily establish the conclusion that a jury frequently rejects it based on disapproval of the aggravating circumstance in question.    Concluding otherwise is sheer speculation.

¶48          The limited information offered by Greene, in contrast to the nature and extent of the data relied on by the Supreme Court in *Coker* and *Enmund*, and other potential causes for the alleged infrequent imposition of a sentence of death based on the (F)(5) aggravating circumstance is inadequate "to demonstrate that juries . . . consider death a disproportionate penalty" for a murder motivated by the expectation of pecuniary gain.    *See Enmund*, 458 U.S. at 796.    The superior court erred in

relying on this data, along with legislative action, to conclude there was an evolved standard of decency against Greene's punishment.

### c. *Judgment of prosecutors*

**¶49**      Greene argues that the views of prosecutors provide further evidence of an evolved standard of decency. However, we concur with the superior court's assessment that "[a]bsent sufficient evidence, none of which was supplied in the legislative hearings, [the PCR] petition, and . . . subsequent pleadings and testimony," the record makes it "difficult to discern the amount of historical prosecutorial discretion utilized in seeking or not seeking the death penalty under the (F)(5) aggravating circumstance." Given the need for objective data upon which to establish a contemporary standard for purposes of making a constitutional determination, the lack of evidence of the judgment of prosecutors concerning use of the previous (F)(5) aggravating circumstance provides no basis upon which to discern a community standard.

### d. *Historical development*

**¶50**      The State argues that no such consensus exists against carrying out Greene's sentence under the circumstances of his case. Greene argues that evidence in the form of state and international data and actions of state courts establish that a consensus exists that no one should be executed where their crime is no longer eligible for the death penalty.

### i. *State practice and international opinion*

**¶51**      In prior cases concerning review of capital punishment under the Eighth Amendment, "the Court has been guided by . . . 'state practice with respect to executions.'" *Kennedy*, 554 U.S. at 421 (quoting *Roper*, 543 U.S. at 563). The Supreme Court has also referenced international views. *See, e.g.*, *Coker*, 433 U.S. at 596 n.10 ("In [*Trop*, 356 U.S. at 102], the plurality took pains to note the climate of international opinion concerning the acceptability of a particular punishment."); *Thompson v. Oklahoma*, 487 U.S. 815, 830 (1988) (referencing the views of "other nations that share our Anglo-American heritage" and of "the leading members of the Western European community"); *Enmund*, 458 U.S. at 796 n.22 (stating "[i]t is thus worth noting that the doctrine of felony murder has been abolished in England and India, severely restricted in Canada and a number of other

Commonwealth countries, and is unknown in continental Europe"); *Roper*, 543 U.S. at 578 (noting that "the overwhelming weight of international opinion against the juvenile death penalty" is not controlling but "does provide respected and significant confirmation" for the Court's determination that the penalty is disproportionate punishment for offenders under eighteen).

**¶52** Greene relies on two sources detailing the dates of a full or partial repeal and the date of the last execution to illustrate state practices and international views. *See* James R. Acker & Brian W. Stull, *Life After Sentence of Death: What Becomes of Individuals Under Sentence of Death After Capital Punishment Legislation Is Repealed or Invalidated*, 54 Akron L. Rev. 268, 276 (2021) ("Acker and Stull"); Declaration of John Ortiz Smykla. The Acker and Stull article details the dates of state repeals of the death penalty and the dates of the last execution, respectively. Acker & Stull, *supra* at 275–319. The comparison of the two dates reflects a conclusion that no state has carried out an execution following the repeal of the death penalty. John Smykla reached a similar conclusion based on his review of an extensive database of execution data from 1608 to 2002. *See* M. Watt Espy & John Ortiz Smykla, *Executions in the United States, 1608–2002: The ESPY File (ICPSR 8451)*, National Archive of Criminal Justice Data (Jul 20, 2016), https://doi.org/10.3886/ICPSR08451.v5.

**¶53** However, the utility of this information rests on Greene's misunderstanding of the nature of the 2019 amendments and his conclusion that his criminal conduct is no longer subject to capital punishment. As discussed, the Arizona Legislature did not "repeal" the death penalty for murders committed under circumstances like Greene's crime. *See* Part II.B.2 ¶¶ 23–26. Therefore, whatever evidence of a consensus that might be derived from the data provided by Greene is inapposite to his case.

**¶54** Furthermore, we take note of Justice O'Connor's observations in her concurrence in *Thompson v. Oklahoma*:

> In the 1950's and 1960's, more States abolished or radically restricted capital punishment, and executions ceased completely for several years beginning in 1968. H. Bedau, The Death Penalty in America 23, 25 (3d ed. 1982).

In 1972, when this Court heard arguments on the constitutionality of the death penalty, such statistics might have suggested that the practice had become a relic, implicitly rejected by a new societal consensus. Indeed, counsel urged the Court to conclude that "the number of cases in which the death penalty is imposed, as compared with the number of cases in which it is statutorily available, reflects a general revulsion toward the penalty that would lead to its repeal if only it were more generally and widely enforced." *Furman v. Georgia*, 408 U.S. 238, 386 (1972) (Burger, C.J., dissenting). We now know that any inference of a societal consensus rejecting the death penalty would have been mistaken. But had this Court then declared the existence of such a consensus, and outlawed capital punishment, legislatures would very likely not have been able to revive it. The mistaken premise of the decision would have been frozen into constitutional law, making it difficult to refute and even more difficult to reject.

487 U.S. at 855 (1988).

### ii. *Judicial action*

**¶55** Greene also argues that judicial actions demonstrate a consensus regarding a standard of decency concerning the imposition of the death penalty in his case. He notes that in some states where legislative action repealed the imposition of the death penalty, state courts have found that carrying out a sentence imposed pre-repeal would violate the Eighth Amendment or corollary state provisions. *See Fleming v. Zant*, 386 S.E.2d 339, 343 (Ga. 1989); *Van Tran v. State*, 66 S.W.3d 790, 812 (Tenn. 2001); *State v. Santiago*, 122 A.3d 1, 85 (Conn. 2015); *Fry v. Lopez*, 447 P.3d 1086, 1121–22 (N.M. 2019); *State v. Bartol*, 496 P.3d 1013, 1028–29 (Or. 2021). However, the nature of the legislative action at issue before the courts in those cases is distinguishable from Arizona's legislative action here.

**¶56** Because Arizona did not enact legislation outright repealing the death penalty or preclude its imposition for the same conduct as Greene's, we focus our review of judicial action on states, like Arizona, who have amended their statutes addressing aggravating circumstances without completely eliminating imposition of capital punishment. These

states include Indiana, Nevada, and Oregon.[10] *See* 2014 Ind. Acts 136 (repealing Ind. Code § 35-50-2-9(b)(1)(D) (statutory aggravating circumstance of "criminal deviate conduct" and (H) (statutory aggravating circumstance of "carjacking")); 1997 Nev. Stat. Ch. 356 (removing "sexual assault" from Nev. Rev. Stat. § 200.033(4)); 2019 Or. Laws, ch. 635, § 1 (redefining and severely limiting capital-sentence eligible "aggravated murder" in Or. Rev. Stat. § 163.095). Among these states, the supreme courts of Indiana and Nevada affirmed capital sentences imposed prior to the repeal of applicable statutory aggravating circumstances. *See Gibson v. State*, 51 N.E.3d 204, 211 (Ind. 2016); *Hill v. State*, 953 P.2d 1077, 1086 (Nev. 1998); *Bolin v. State*, 960 P.2d 784, 801 (Nev. 1998), *abrogated on other grounds by Richmond v. State*, 59 P.3d 1249 (Nev. 2002).

¶57 In Indiana, the repeal of § 35-50-2-9(b)(1)(D) and (H) applied prospectively based on the express terms of the statute. Specifically, the statute stated that "criminal deviate conduct" and "carjacking" aggravating circumstances are only applicable to crimes committed "before [their] repeal." *See* Ind. Code § 35-50-2-9(b)(1)(D); (H). In 2016, the Indiana Supreme Court upheld the use of the "criminal deviate conduct"

---

[10] South Dakota's legislature repealed a provision permitting use of impact testimony from the victim's family as an aggravating circumstance. 1994 S.D. Sess. Laws ch. 178 § 1 (repealing S.D. Codified Laws § 23A-27A 1(11)). However, no cases have been found which relied on that aggravating circumstance to impose a capital sentence. Further, there is some question about whether placing victim impact testimony in § 23A-27A 1(11) meant it could be used as a capital aggravating circumstance. *See Rhines v. Young*, No. 5:00-CV-05020-KES, 2016 WL 615421, at *18 (D.S.D. Feb. 16, 2016), aff'd, 899 F.3d 482 (8th Cir. 2018) ("[N]o plausible reading of the statute supports a conclusion that victim impact evidence was itself a statutory aggravating circumstance.").

aggravating circumstance, (b)(1)(D), for a crime committed in 2012. [11] *Gibson*, 51 N.E.3d at 211.

¶**58**        Before 1997, Nev. Rev. Stat. § 200.033(4) provided as an aggravating circumstance:

> The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged:
>
> (a) Killed or attempted to kill the person murdered; or
>
> (b) Knew or had reason to know that life would be taken or lethal force used.

¶**59**        The Nevada legislature removed the words "sexual assault" in 1997.   1997 Nev. Stat. Ch. 356.   In 1998, the Nevada Supreme Court affirmed two capital sentences that were imposed based on the "sexual assault" language prior to the amendment of § 200.033(4).   *Hill*, 953 P.2d at 1085 (denying defendant's PCR claims and affirming capital sentence for 1983 murder of victim who died from injuries sustained from sexual assault); *Bolin*, 960 P.2d at 801 (1998), *abrogated on other grounds by Richmond v. State*, 59 P.3d 1249 (2002) (affirming capital sentence for 1995 murder committed during sexual assault).   Both cases simply applied the version of § 200.033(4) in effect at the time each defendant committed murder after sexually assaulting their victims.

---

[11] We note that the Indiana Supreme Court did retroactively vacate a sentence of death on the basis of legislative action in the case of *Saylor v. Indiana*, 808 N.E.2d 646, 648–51 (Ind. 2004).   The Indiana court therein concluded "it is not appropriate to execute a person who was convicted and sentenced through a procedure that has now been substantially revised so the same trial today would no longer render the defendant eligible for the death penalty."   *Id.* at 647.   We do not have similar procedural differences here.

¶60        The Oregon Supreme Court reached a different conclusion in *Bartol*. 496 P.3d 1013. While the case seems at first glance to be similar to Greene's, there are two key differences. First, the Oregon state legislature reclassified the criminal conduct "that . . . constituted 'aggravated murder,' which can be punished by death, to 'murder in the first degree,' which cannot be punished by death." *Id.* at 1015.

¶61        At hearings on the proposed amendments, proponents and opponents asked the Oregon legislature to "make an assessment regarding the relative gravity of the conduct that was classified as 'aggravated murder' at the time[,]" and to determine that such conduct was not the "'worst of the worst' and to reclassify it as 'murder in the first degree,' the maximum sentence for which would be life in prison without parole." *Id.* at 1027–28. Legislators in both chambers of the Oregon legislature repeated these concerns. *Id.* at 1028.

¶62        Based on this extensive legislative history—and second key difference—the court concluded that the very amendment of the statute, although prospective only, reflected a "legislative determination that the *conduct* that was classified as 'aggravated murder' before [the amendments] does not fall within the narrow category of conduct for which the death penalty can be imposed." *Id.* (emphasis added). Therefore, "[m]aintaining [Bartol's] death sentence would allow the execution of a person for conduct that the legislature has determined no longer justifies that unique and ultimate punishment." *Id.* at 1029; *see also State v. Rogers*, 499 P.3d 45, 48 (Or. 2021) (finding legislative amendments "create[d] a proportionality problem" by allowing "the execution of persons whose conduct the legislature has determined is *not* the worst of the worst and whose culpability is *no different* from those who cannot be executed" (quoting *Bartol*, 496 P.3d at 1028)).

¶63        The Arizona Legislature, however, has not redefined or reclassified what constitutes a capital-eligible homicide. In fact, the definition of first degree murder applicable to Greene's murder of Johnson

in 1995 is substantively the same for murders today.[12]   And even under *Bartol*'s reasoning, because Greene's criminal conduct remains subject to capital punishment, the Arizona Legislature has not created the proportionality issue raised by Oregon's legislation.   Furthermore, our legislative record contains nowhere near the same degree of information to support the conclusion reached by the Oregon court.   Therefore, *Bartol* is distinguishable based on its facts and the law.

**¶64**        Thus, among states that have prospectively repealed aggravating circumstances considered for imposing the death penalty, state supreme courts have affirmed capital sentences based on a subsequently repealed aggravating circumstance where it was lawful when first imposed. Therefore, Greene's argument that judicial action supports a consensus against carrying out his sentence is misplaced.

---

[12] The definition of first degree murder in 1995 provided that:

> A person commits first degree murder if . . . [i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation; or . . . . Acting either alone or with one or more other persons such person commits or attempts to commit . . . robbery under section 13–1902 . . . and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person.

§ 13-1105(A) (1995).   The current version reads:

> A person commits first degree murder if . . . [i]ntending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation or . . . . Acting either alone or with one or more other persons the person commits or attempts to commit . . . robbery under § 13-1902 . . . and, in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person.

§ 13-1105(A) (2022).

¶65        Overall, Greene's argument that a consensus exists against carrying out a capital sentence where the criminal conduct is no longer subject to the death penalty is unavailing.   The Arizona Legislature did not eliminate the imposition of capital punishment for his criminal conduct. Hence, evidence of the outright repeal of the death penalty by other state legislatures or by foreign countries is of little utility in discerning a consensus on our facts.   Likewise, the limited information regarding jury sentencing decisions does not serve to establish a community standard that renders Greene's sentence disproportionate to his crime.   Finally, the actions by state supreme courts in affirming capital sentences based on prospectively repealed aggravating circumstances reveals, if anything, a consensus that such sentences are lawful.

2.   Independent judgment

¶66        "Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty." *Enmund*, 458 U.S. at 797.

¶67        We consider whether Greene's sentence serves the penological purposes of the death penalty in exercising our independent judgment.   *Atkins*, 536 U.S. at 317–21 (evaluating penological purposes of death penalty in light of defendant's particular culpability); *Kennedy*, 554 U.S. at 441–42 (analyzing penological purposes in light of defendant's crime of rape).   Greene argues that to carry out his sentence would be arbitrary given that it could not possibly serve a constitutionally cognizable penological purpose.

¶68        The death penalty is an appropriate sanction when it advances the penological goals of deterrence and retribution.   *See Enmund*, 458 U.S. at 798.   Otherwise, it "is nothing more than the purposeless and needless imposition of pain and suffering."   *Id.* (quoting *Coker*, 433 U.S. at 592).

¶69        A death sentence has deterrent value if it would deter other persons from committing the same crime as the one the defendant committed.   *See, e.g.*, *Kennedy*, 554 U.S. at 445; *Atkins*, 536 U.S. at 320. Accordingly, Greene argues that "[w]hen the Legislature repeals the death penalty for a class of crimes, executing a defendant under facts that would

no longer qualify for the death penalty cannot possibly deter future murders of any kind." Regardless of their motive, those who commit the same crime as Greene—killing in the course of a robbery—are still subject to the continuing applicability of the (F)(2) aggravating circumstance. Therefore, the deterrent value of Greene's sentence remains.

¶70 Retribution serves to punish the perpetrator and gives voice to the moral outrage experienced by the victim and society at large. *Santiago*, 122 A.3d at 56. It "reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused." *Kennedy*, 554 U.S. at 442; *see also* Ariz. Const. art. II, § 2.1 (listing specific enumerated rights "[t]o preserve and protect victims' rights to justice and due process"). But, as Greene accurately notes, retribution does not necessarily justify imposition of the death penalty for every first degree murder. "[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg*, 428 U.S. at 184. The death penalty "must [therefore] 'be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution.'" *Kennedy*, 554 U.S. at 420 (quoting *Roper*, 543 U.S. at 568).

¶71 The conduct Greene engaged in, aside from his motive to murder, remains subject to a sentence of death and his actions in murdering Johnson continue to fall within that narrow category of the most serious crimes. Therefore, the retributive purpose served by his sentence in 1996 is still reflected in and served by Arizona law today. Given that Greene's sentence fulfills the penological goals of deterrence and retribution, it is our considered judgment that his sentence is proportionate to his murder of Johnson.

¶72 Based on the lack of a consensus against Greene's punishment and our judgment that his sentence is not disproportionate to his crime, we conclude that Greene's sentence of death does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

## D.   Article 2, Section 15

¶73   The State argues that because we previously affirmed Greene's sentence and no holding since has found the (F)(5) aggravating circumstance unlawful, the sentence also does not violate article 2, section 15 of the Arizona Constitution.   Greene asserts that because this Court interprets our constitutional ban on cruel and unusual punishment according to federal Eighth Amendment jurisprudence, we should take guidance from clearly established United States Supreme Court caselaw explaining how to determine contemporary standards of decency and find his sentence unconstitutional under the Arizona Constitution.   *See State v. Jackson*, 186 Ariz. 20, 25 (1996) ("Arizona's constitutional prohibition against cruel and unusual punishment is identically worded to its federal counterpart, and . . . we give them the same meaning." (quoting *State v. Bartlett*, 164 Ariz. 229, 240 (1990))).

¶74   However, as this Court remarked in *State v. Bush*, 244 Ariz. 575 (2018), we have "not yet expressly embraced as a matter of state constitutional law" the notion of "the evolving standards of decency in our maturing society" as part of our death penalty jurisprudence under article 2, section 15 of the Arizona Constitution.   *Id.* at 599 ¶ 108; *see also State v. Soto-Fong*, 250 Ariz. 1, 5-6 ¶¶ 10–13 (2020) (expressing concerns over the Supreme Court's Eighth Amendment analysis).   Regardless, for the reasons explained regarding Greene's sentence and the Eighth Amendment, we would not reach a different result.

¶75   Therefore, Greene's argument and the superior court's conclusion that "evolving standards of decency" render his sentence unconstitutional pursuant to article 2, section 15 of the Arizona Constitution is incorrect.   Instead, we conclude that Greene's sentence was lawfully imposed and is not in violation of article 2, section 15 of the Arizona Constitution.   *Greene*, 192 Ariz. at 444.

## E.   Claims For Relief Under Rule 32.1

¶76   "We interpret court rules according to the principles of statutory construction."   *Phillips v. O'Neil*, 243 Ariz. 299, 301 ¶ 8 (2017) (quoting *State v. Aguilar*, 209 Ariz. 40, 47 ¶ 23 (2004)).   Thus, we "interpret rules of procedure by their plain meaning and we read them in conjunction with each other and harmonize them whenever possible." *State v. Tillmon*,

222 Ariz. 452, 454 ¶ 8 (App. 2009) (internal alterations omitted) (quoting *Groat v. Equity Am. Ins. Co.*, 180 Ariz. 342, 347 (App. 1994)).

### 1. Rule 32.1(a)

¶77 Rule 32.1(a) permits relief when "the defendant's . . . sentence was imposed . . . in violation of the United States or Arizona constitutions." The State argues that the plain language of the rule precludes consideration of Greene's claim because the amendments to (F)(5) are prospective only and Greene's sentence, as previously upheld by this Court, did not violate either the United States or Arizona Constitutions at the time it was imposed. Greene's argument focuses on the alleged current illegality of his sentence due to the (F)(5) amendments.

¶78 We agree with the State that the wording of Rule 32.1(a) applies to addressing whether a sentence violated the United States or Arizona Constitutions at the time it was imposed. Given that the amendments are not retroactive, Greene's sentence based on the (F)(5) aggravating circumstance is reviewed under the capital sentencing scheme in effect at the time he killed Johnson. A.R.S. § 1-246 ("[O]ffender[s] shall be punished under the law in force when the offense was committed."); *see also State v. Superior Court*, 139 Ariz. 422, 427 (1984) ("Unless a statute is expressly declared to be retroactive, it will not govern events that occurred before its effective date."); *State v. Morales*, 129 Ariz. 283, 286 (1981) (applying statute "in effect at the time" the crime was committed).

¶79 As the State correctly notes, Greene's sentence was constitutional when imposed. *Greene*, 192 Ariz. at 444; *see also State v. Hidalgo*, 241 Ariz. 543, 550–51 ¶¶ 23–29. Furthermore, we have affirmed two capital sentences based on repealed or amended statutory aggravating circumstances since the 2019 amendments, although in each case juries also found other aggravating circumstances. *See State v. Smith*, 250 Ariz. 69, 93 ¶ 106 n.6 (2020) (acknowledging amendment of (F)(5) but the former "version of the pecuniary gain statute applie[d]" in case where jury also found state proved (F)(2) serious offense aggravating circumstance); *Thompson*, 252 Ariz. at 289 ¶ 16 n.4 (2022) (acknowledging amendments but citing "the version of § 13-751 in effect at the time of sentencing" that included the (F)(13) aggravating circumstance where jury also found state proved four others, (F)(2), (F)(6), (F)(7), and (F)(8)). Therefore, the

superior court erred in concluding otherwise and Greene is not entitled to relief under Rule 32.1(a).

2. Rule 32.1(c)

**¶80** Rule 32.1(c) permits relief where "the sentence as imposed is not authorized by law."

**¶81** The State argues that Greene is not entitled to relief because 32.1(c) only applies to cases in which a term-of-years sentence is imposed and not a death sentence. Furthermore, the State observes that Greene's sentence was "authorized by law" at the time he was sentenced, as the superior court also acknowledged. Greene argues that the plain language and history of Rule 32.1(c) demonstrate it applies to capital sentences that become illegal after sentencing and reiterates his argument that the 2019 Amendments render his sentence unconstitutional under the Eighth Amendment to the United States and article 2, section 15 of the Arizona Constitutions. Therefore, pursuant to Rule 32.1(c), his "sentence as imposed is not authorized by law."

**¶82** With respect to the applicability of Rule 32.1(c) to Greene's capital case, we find, as did the superior court, that it unambiguously applies. Rule 32.1 clearly states that "[a] defendant may file a notice requesting post-conviction relief under this rule . . . in any case in which the defendant was sentenced to death." Nonetheless, because Greene's sentence was lawful when imposed and we have concluded that it is not now unlawful under either the United States or Arizona Constitutions, he is not entitled to relief. The superior court erred in concluding otherwise.

3. Rule 32.1(g)

**¶83** Rule 32.1(g) provides grounds for relief when "there has been a significant change in the law that, if applicable to the defendant's case, would probably overturn the defendant's judgment or sentence." The State argues that the phrase "if applicable" is dispositive because the 2019 amendments to (F)(5) were prospective only. Greene argues that the amendments to (F)(5) are retroactively applicable to his case under the United States and Arizona Constitutions because they demonstrate an evolved standard of decency against carrying out his sentence. Because we have concluded that the amendments are not retroactively applicable

either because they lack an express retroactive statement or because his sentence does not violate the Eighth Amendment nor article 2, section 15, Greene is not entitled to relief under Rule 32.1(g).

4. Rule 32.1(h)

**¶84** Rule 32.1(h) provides relief where: "[T]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish . . . that no reasonable fact-finder would find the defendant eligible for the death penalty in an aggravation phase held pursuant to A.R.S. § 13-752."

**¶85** The State essentially argues that a claim pursuant to 32.1(h) must present clear and convincing evidence addressing facts related to aggravating circumstances presented in the aggravation phase of a capital trial and not based on an argument of legal insufficiency concerning the imposition of a sentence of death in general. Greene argues that "[i]n light of the legislative repeal . . . , no jury could *today* find Greene eligible for the death penalty based on the facts underlying his claim" and he is therefore entitled to relief under Rule 32.1(h). (Emphasis added.)

**¶86** We agree with the State that relief pursuant to Rule 32.1(h) is dependent on the presentation of clear and convincing evidence concerning facts that address the proof of an aggravating circumstance. The very terms of the rule dictate as much by addressing "the facts underlying the claim" in reference to the aggravation phase in § 13-752, wherein "the trier of fact shall make a special finding on whether each alleged aggravating circumstance has been proven based on the evidence that was presented at the trial or at the aggravation phase." A.R.S. § 13-752(E).

**¶87** Greene's argument is unavailing because it assumes that the amendments to (F)(5) are retroactive to his case, which under his Eighth Amendment argument would render his sentence unlawful. Accordingly, there would never be an aggravation phase in which a trier of fact could consider whether an aggravating circumstance was proven. Thus, this argument is more properly presented under Rule 32.1(c).

**¶88**      Also problematic for his argument is our conclusion that the amendments to (F)(5) are not retroactive.   Therefore, any jury considering Greene's eligibility for the death penalty today would make their determination under the statutes applicable to his crime in 1995, and a jury would be able to consider the (F)(5) aggravating circumstance.   *See State v. Stine*, 184 Ariz. 1, 3 (App. 1995) ("[I]n the context of criminal law, an offender must be punished under the law in force when the offense was committed and is not exempted from punishment by a subsequent amendment to the applicable statutory provision." (quoting *State v. Hamilton*, 177 Ariz. 403, 406 (App. 1993))).

**¶89**      Finally, his argument for relief under Rule 32.1(h) fails to present any evidence, let alone clear and convincing evidence, addressing the sufficiency of the facts that established the (F)(5) pecuniary gain aggravating circumstance which this Court upheld on direct appeal. Thus, Greene has not demonstrated a basis for relief under Rule 32.1(h) and the superior court erred in concluding otherwise.

### III.    CONCLUSION

**¶90**      For the reasons stated, we reverse the superior court's ruling granting Greene post-conviction relief and affirm his sentence.